IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| William Basemore | : | Civil Action No. 22-cv-01700 |
| Plaintiff | : | |
| | : | |
| VS. | : | Judge Jennifer P. Wilson |
| | : | **FILED** |
| | : | **SCRANTON** |
| Theodoor Voorstad, et. al., | : | FEB 1 7 2023 |
| Defendants | : | |

PER_____

DEPUTY CLERK

## AMENDED COMPLAINT

I. INTRODUCTION

1. Plaintiff, William Basemore (hereinafter Basemore) pro se, brings this civil action seeking damages pursuant to 42 U.S.C. § 1983 against various prison officials at State Correctional Institution Camp Hill for depriving Basemore, of the party injured rights guaranteed by the First, Eighth, and Fourteenth Amendments of the United States Constitution.

II. JURISDICTION

2. This court has jurisdiction over Plaintiff's claims of federal constitutional rights under U.S.C. § 1331 and § 1343(a)(3) and (4). The matters in controversy arise under 42 U.S.C. Section § 1983 and the First, Eighth, and Fourteenth Amendments of the United States Constitution.

III. PARTIES

3. Plaintiff William Basemore is and was, at all times relevant hereto, a prisoner in the custody of the State Department of Corrections, hereinafter "SDOC." At the time of the events relevant hereto Basemore was incarcerated at

SCI-Camp Hill.

(The following named defendants are hereby being sued in their official and individual capacities).

4. Defendant Theodoor Voorstad [Dr. Voorstad], was at all times relevant hereto, a physician employed/retained by SDOC to provide medical services at SCI-Camp Hill.

5. Defendant Tonya Heist was, at all times relevant hereto, employed/retained as Grievance Coordinator at SCI-Camp Hill.

6. Defendant William Nicklow was, at all times relevant hereto, Deputy Superintendent of Centralized Services employed/retained by SDOC AT SCI-Camp Hill.

7. Defendant Laurel Harry was, at all times relevant hereto, Facility Manager employed/retained by SDOC at SCI-Camp Hill.

8. Defendant Beth Herb was, at all times relevant hereto, Correctional Health Care Administrator [CHCA] employed/retained by SDOC to execute administrative duties upon the medical department [Personnel] at SCI-Camp Hill.

9. Defendant WELLPATH was, at all times relevant hereto, Contracted Medical Vendor [CMV] retained by SCI-Camp.

10. Defendant CENTURION MANAGED CARE was, at all times relevant hereto, Contracted Mental Health Vendor retained by SCI-Camp Hill.

11. Defendant Keri Moore was, at all times relevant hereto, Assistant ["acting"] Chief Grievance Officer employed/retained at SDOC at Pennsylvania Department of Corrections Secretary's Office of Inmate Grievances & Appeals.

12. Defendant Matt Grimes was, at all times relevant hereto, employed/retained at SDOC Camp Hill as a "Psychologist."

13. Defendant Ademola Bello was, at all times relevant hereto, a Psychiatrist employed/retained by SDOC at Camp Hill.

14. Defendant "Jane Doe" was, at all times relevant hereto, a Registered Nurse employed/retained at SDOC at Camp Hill.

IV. FACTS

15. State Correctional Institution Camp Hill on Housing Unit November [N] Block during the dispensing of evening medication. Plaintiff awaited the nurse who would dispense the evening dosage of Feminizing Hormone Therapy/Hormone replacement Therapy medication, was told by the nurse the following: "You don't get any more medication", and then they [she] walked off. Plaintiff would later be called to the medical department. Plaintiff, when meeting with Defendant Voorstad, inquired about the sudden termination of said hormones. Plaintiff was told, by Defendant Voorstad: "You have to wait like everyone else." Plaintiff followed up with: "Being that I've signed the consent form and have taken said hormones for approximately three weeks, why can't I continue? Defendant Voorstad stated: "If I do it for you we'll have to do it for everyone."

16. Plaintiff would later speak with assigned Psychologist [Grimes]. Psychologist Grimes informed Plaintiff about that which Plaintiff had already discovered. However, in addition to receiving psychological counseling, Psychologist Grimes let Plaintiff know that (the following are Psychologist Grimes words): "someone dropped the ball." Plaintiff would later be told to go to see George Clements (counselor for the classification of programs managing and prison rape elimination act) [CCPM/PREA Compliance Manager]. During the encounter Plaintiff had with George Clements Plaintiff was informed, by George Clements,of the following: "Starting you early was a mistake' now, we're going to go through the proper channels and start the process again.."_____

Please Note" Said meeting with assigned Psychologist Grimes took place one on one in one of the two counselor offices on November block B-side [N/B]. The meeting with George Clements took place one on one in one of the two counselor offices on

November block, B-side [N/B]. Shortly thereafter Plaintiff initiated the grievance process by filing a DC- 804 (part 1) on 7/16/21. Plaintiff received the Initial Review Response denying the grievance. Plaintiff went on to the second level of appeal. Plaintiff received a response denying the second level appeal. Having concluded in-house appeals Plaintiff appealed outside the prison for a Final Review by the Secretary's Office of Inmate Grievances & Appeals. Plaintiff received a Grievance referral (Notice to Inmate) on "11/02/2021 04:18." Final Appeal Decision was received by Plaintiff dated 3/10/22. Thus the grievance was held in abeyance [tolling statute] for eight (8) months since the initial filing. See: Exhibit: H Grievances-Appeals)

17. The date on which the event giving rise to Basemore's claim occurred on August 12, 2020.

18. Basemore underwent several weeks of psychological counseling, with then assigned Psychologist Grimes [Mr. Grimes], before having a referral made for Basemore to meet with personnel from the Psychiatry Department.

19. Basemore, on 7/22/20, met, via video-conference, with psychiatrist Ademola Bello [Dr. Bello]. Basemore was assessed and diagnosed as having Gender Dysphoria. Said psychiatrist informed Basemore of the following: Quote: "They may start you right away with hormone treatment."

20. On 7/24/20, Basemore was giving a "pass" to go to the medical department. Basemore met with Defendant Voorstad [Dr. Voorstad]. Defendant Voorstad made it known to Basemore that there were no contraindications discovered. Defendant Voorstad then presented to Basemore a DC-572 Informed Consent for Feminizing Hormone Therapy treatment.

21. Defendant Voorstad read aloud the DC-572 Informed Consent. Baemore, in earnest, inquired about the "birth control" options. Said inquiry was not addressed. Basemore and Defendant Voorstad signed, "electronically", the DC-572,

as a signatory agreement to preserving the stipulations therein (signatures captured on "07/24/20; 14:02:42- see Exhibit: A).

22. Basemore, on 8/12/20, had their Hormone Replacement Therapy abruptly/peremptorily removed minus any evidence and/or information being discussed or shown in documented format to Basemore regarding contraindications or security concerns. Plaintiff immediately submitted Inmate Request to assigned Psychologist Grimes, followed by an Inmate Request to then Prison Rape Elimination Act [PREA] Compliance Manager Kendall regarding the sudden stoppage. Plaintiff met with assigned Psychologist Grimes who made it known to Basemore that, due to a lack of communication between departments, treatment had been stopped because: Quote: "Somebody dropped the ball." (see Exhibit: B1, B2 (reverse side), and B3).

23. Basemore, on 8/14/20, submitted a second Inmate Request to then PREA Compliance Manager Kendall informing her, in part, about concerns regarding the unforeseen occurrence which unfolded, as well as seeking to know the name of the psychiatrist who made the assessment and diagnosis of Basemore (see Exhibit: C).

24. Basemore would later meet with Defendant Voorstad at which time Basemore appealed to Defendant to reinstate said treatment. Defendant's response to Basemore (as noted in the initial grievance) was as follows: "If we do it for you we'll have to do it for everyone."

25. On 8/27/20, Basemore's diagnosis, as one having Gender Dysphoria (as assessed by Psychiatrist Ademola Bello), was removed.

26. Basemore, on 12/14/20, sent an Inmate Request to then PREA Compliance Manager Kendall regarding a need to speak with assigned Psychologist Grimes, in part concerning Basemore's desire to have an Orchectome (see Exhibit: D).

27. Basemore, on 12/22/20, sent an Inmate Request to Psychologist Howdyshell expressing the need to speak with their assigned Psychologist [Grimes] (se

Exhibit: E).

28. Basemore, in the month of April of the year 2021, met with assigned Psychologist Grimes. Basemore was made aware of their assessment and diagnosis, by Psychiatrist Bello, as one being placed under the classification of gender Dysphoria, as being removed.

29. Basemore, on 9/23/21, met withthe Psychiatric Review Team [PRT], consisting of Site psychiatrist Mushgaq, Site Psychologist Stein, Assigned Psychologist Grimes, Unit Manager Digby, and Counselors Arnold and Fagnani. Basemore's Gender Dysphoric condition was "re-established" by Site Psychiatrist Mushgaq.

30. On 10/4/21, Basemore was scheduled to meet with the medical department. Said meeting never took place.

31. On 10/5/21, Basemore was scheduled to meet with the medical department. Said meeting never took place.

32. Basemore, on 10/22/21, submitted an Inmate Request to Corrections Health Care Administrator [CHCA] Beth Herb. Basemore informed Defendant Herb about the PRT meeting and that steps were taken to restart hormone therapy (see Exhibit: F).

33. Basemore, on 10/22/21, submitted an Inmate Request to Psychiatrist Mushgaq informing her that another month has passed and hormone therapy had not resumed. Baemore's inquiry was for the sake of coming into knowing who they could write to for answers regarding the unnecessary and extended delay. (see Exhibit: G)

34. Basemore, for several month, has had no mental health sessions with (a twice a year evaluation, every six months) with any psychologist. Plaintiff made an inquiry to Psychologist Howdyshell several months ago to know (1) will assigned psychologist return and, if not, (2) please assign someone.

page 6 of 19

35. Per policy (NCCHC, WPATH, UpToDate, etc), Basemore is entitled to competent, clinically trained, licensed, knowledgeable, and culturally competent mental health professional personnel.

36. Basemore has had no contact with a Psychiatrist since 9/23/21.

37. Basemore, in a weakened and distraught state, was able to be misled by Defendant Voorstad into signing, even after questioning its purpose, being that the original consent form was never nullified, a second consent form if I want to receive hormone treatment (see Exhibit: Consent Form II).

38. Under the Guidelines of the 13.2.1 Access to Health Care Procedures Manual; Section 19-Diagnosis and Treatment of gender Dysphoria (C.) Training, Paragraph (1) and (2), the Registered Nurse, as Mandatory language of the above said paragraph dictates for the training of staff, must be a psychiatric Certified Registered Nurse Practitioner [PCRNP] (see Exhibit: Prerequisite and-- ) Said individual shall have specific prerequisites and qualifications. In addition to a background as a Registered Nurse [RN] being required, a two year associate degree in nursing, a three-year hospital-based nursing diploma, or a four-year bachelor's degree at a college or university in acquiring the extensive knowledge of nursing, mental health assessment and diagnosis, Psychotherapy, and Psychopharmacology (see Exhibit Prerequisites and Qualifications).

39. Current protocol dictates a refraining from abrupt stoppage of hormone therapy but not the obverse- being titrated and stepped down (see Exhibit: DC -135A INMATE'S REQUEST TO STAFF MEMBER dated: 9/7/22).

40. In being properly titrated and stepped down, as recommended, may lead to a reduced risk of an increase in blood pressure which may lead to a heart attack or stroke, especially for one who has a family history of cardiovascular complications.

41. Although Basemore, a non-smoker, (smoking combined with estrogen usage

creates complications- risk of blood clots, stroke, heart attack)is not exempt from above said complications.

42. Muscle atrophy (decrease in muscle mass/strength) will be progressive due to lifelong usage. Dietary supplement such as Ensure/Boost (something that Basemore is not currently receiving), coupled with exercise, which Basemore is receiving, counterbalances muscle lost and stength.

43. Basemore is being deliberately left in the "high risk" category for Venous Thromboembolism [VTE] by being administered oral, as oppose to Transdermal patch for their age group (see Exhibit: RISK OF HORMONE THERAPY).

_____

Footnote: With regard to paragraphs 40, 41, 42, and 43, Basemore, upon discovering that a history of cardiovascular complications runs in her family immediately submitted a Sick Call Request to medical so as to make said information known for the purpose of having it catalogued into her medical file (see Exhibit: Sick Call Request I and Sick Call Request II. Said Request do not reflect discussions Plaintiff had with Physician Assistant).

44. Basemore was placed under Defendant Matt Grimes supervision and care while undergoing emotional and physiochemical changes due to hormonal therapeutic treatment. Basemore was under the belief, due to the established pretense allowed by the Department of Corrections, and her affiliates, to have been receiving up to code, policy, health, ethical training, and responsibility thereto, to now have found that Defendant Matt Grimes was not certified, nor in most part, equivalently qualified to undertake Baemore's psychological needs.

## V. CAUSE OF ACTION

Count I (An Eighth Amendment Deliberate Indifference To Serious Medical Needs - And- Due Process and Equal Protection). Basemore incorporates, by referencing III. Statement of Facts (A), full discussion within the body of facts of this complaint, along with all exhibits affixed hereto.

45. The aforementioned nurse [Defendant: 6]* in this matter made a conscious decision to respond to Basemore's show of compliance towards their job function, in part, to dispense medication, led to what would become an ongoing exposure of a deliberate delay in Basemore's hormonal treatment for reasons that could've been avoided if the Mandatory supplementing directive/guidelines, as articulated in the Transgender and Gender Diverse Health Care in Correctional Settings, as adopted by the National Commissions on Correctional Health Care Board of Directors [NCCHC], World Professional Association for Transgender Health [WPATH], Hormonal Therapy for Transgender Patients [TAU-Translational Andrology and Urology], policy 13.2.1, Access to Health Care Procedures manual; Section -Diagnosis and Treatment of Gender Dysphoria, as well as UpToDate, a propriety online software program, were followed by SCI-Camp Hill's health care personnel.

46. The practitioners who specializes in transgender care, in addition to being mandated to having a current subscription to the above said online program, must be properly trained by the Contracted Medical Vendor [CMV]. Psychiatrists, Psychiatric Certified Registered Nurse Practitioners, License Psychologist Managers, License Psychologist, Psychological Services associates, and Social Workers shall be properly trained by the Contracted Mental Health Vendor [CMHV]. The above said vendors shall provide an annual training report to the BHCS.

47. (IVa) Defendant Beth Herb's job capacity as CHCA is, in part, a primary channel for the communicating of information from sub-departments (medical personnel) and Administrative personnel outside, although connected to her

_____

* Defendant "Jane Doe" [Nurse], currently not in Plaintiff's possession, will be revealed upon request for Documents and Discovery

department. In addition, Defendant Herb must be cognizant regarding the evaluations generated by the Psychiatry, Psychology, and Medical departments so as to compile the three evaluations for Individual Recovery Plan [IRP] approval. Defendant Herb must relay the evaluations to the BHCS in which the Gender Dysphoric Review Committee [GDRC] shall initiate a vote sheet [DC-542] for approval. The IRP shall be returned to the CHCA as either approved, or with recommendations.

48. (IV.b) Transsexualism, which includes several sub-categories (psychiatric, psychological, and medical, in part) is a very complex phenomenon, and thus presents both serious and special needs.

49. (IV.c) Count II (Deprivation of Medical Treatment: In Violation of Eighth Amendment U.S. Constitution; Eighth Amendment Deliberate Indifference To Serious medical Needs).

50. (IV.d) Basemore incorporates by referencing III. Statement of Facts (A), full discussion within the body of facts of this complaint along with all exhibits affixed hereto.

51. (IV.e) Basemore, being well into their third week of hormone replacement therapy was met with deliberate indifference when Defendant Voorstad chose to take an independent, self-imposed approach towards Basemore's serious medical needs (see Exhibit: H Grievance and Appeals).

52. (IV.f) Defendant Voorstad not only deliberately circumvented policy, for in Basemore's case, their hormonal treatment. They refused to acknowledge that even a prison's medical policy might be too inelastic in dealing with said identity disorder. Decisions for that person, in this case Basemore, should be based on an individualized approach, as oppose to an inelastic general rule, which is Eighth Amendment unaccepatable when the path for treatment leads to harm being incurred by the practitioners.

53. (IV.g) Count III (Intentional infliction of Biochemical-Physiological interference, Atrophy, Transubstantiation, Chemical Castration, and Depression in violation of Basemore's 1st, 5th, 8th, and 14th Amendment Rights.

54. (IV.h) Plaintiff incorporates, by referencing III. Statement of Facts (A)(B) and (C) full discussion within the body of the facts of this complaint along with all exhibits affixed hereto.

55. Basemore, as an American Citizen, shall be afforded the same liberties as any other American Citizen irregardless of social and/or economic status. Such an inalienable right is predicated upon the United States Constitution.

56. Defendant Voorstad's conscious decision to intentionally interfere with the Standards Of Care [SOC] policy makes Defendant blameworthy, and said actions inexcusable.

57. Basemore underwent a period of 17.3 months of hormonal inactivity only to be met with a Final Appeal that stated: Quote: "No evidence of wrongdoing was identified." Said appeal goes on to urge Basemore to "participate in your treatment plan and discuss your concerns or changes of conditions with a practitioner." Defendant Moore, who answered the Final Appeal, had at their disposal, all documentation relating to the steps Basemore took in reaching out to said "practitioner."

58. Defendant herb had, at their disposal, all documentation relating to the steps that Basemore took in reaching out to said "practitioner."

59. The Defendants, which comprises the Contracted Medical Vendor [CMV] and the Contracted Mental Health Vendor [CMHV], are liable for the harm done to Basemore due to their poor training and supervision of the Health Care Personnel, who, in their job capacity, are required to perform an unique service on a small population that is listed under the title of Transgender care (see Exhibit: Training).

60. (IV.i) Defendant's deliberate indifference to Basemore's serious medical needs broaden when they failed to take into account the level of harm of the physiological reversing of biochemical and cellular anatomical components both immediate and long term future effects of taking medications that are clearly marked in bold hazard Drug (see Exhibit: Interruption/Reversal).

61. all medications have side effects. However, Estradiol (Estrace) and Spironolactone have a Pharmacodynamics and Pharmacokinetics which places them beyond the realm of ordinary aspirin. The known physical effects are, in part, Neurophysiological, Biochemical, Cellular, all of which being physical manifestations, culminate in the form of gross physical changes.

62. (IV.j) Deliberate indifference  is met when there are no showings of contraindications (health/security related) which could, possibly, warrant the removal of treatment. In having the abrupt stoppage coupled to an unnecessary 17.3 month delay mentally and psychologically removed Baemore from a stage of believing that an improvement of their quality of life was finally in motion to one that is now comorbid, returning to bouts of depression and hopelessness.

63. (IV.k) Basemore experience with the appearance of Montgomery Gland, only to have them fall victim to atrophy, the decrease of sperm count and production with the possibility of not returning to a level that would return Basemore to the level of being a procreant, is the equivalent of chemical castration if birth control options [sperm freezing] is not immediately implemented, due in part to the return of hormone therapy (which was never acknowledged in the Final Appeal response- there's no resolution mentioned in the Final Appeal Response, just a "tossing of the ball" back into "practitioner's hands"), although improperly administered for Basemore's age group, does nothing other than metamorphoses Basemore into a transmogrification of their current self (see Exhibit: Reproductive Health)( Count III; IV.g-IV.k constitutes cruel and unusual

punishment.

64. (IV.l) Count IV (Maldministration and the need for Mandatory Special Needs Training)

65. (IV.m) Basemore incorporates by referencing III. Statement of Facts (A)(B) and (C), full discussion within the body of facts of this complaint along with all exhibits affixed hereto.

66. (IV.n) Basemore ask that the Court take judicial notice of the following upon review of claims of systemic defect as manifest by the actions, and lack thereof, of the those named Defendants. The aforementioned Consent Form is, for all intent and purpose, and agreement analogous with contract. The Consent Form [DC-572] clearly outlines all reasons for justifying termination (see attached DC-572, page 2, paragraph 7 and Monitoring Feminizing Hormone paragraph 3). The tangible and legally binding Form was not viewed by Defendant Voorstad as being such. A lack of structured responsibility and accountability, due to the systemic defects initiated by Defendants by consciously refusing to follow the Standards Of Care guidelines/protocol, is commingled with the deliberate indifference expressed upon Basemore.

67. (IV.o) While a single instance of an omission or a single delay, viewed in isolation, may appear to be the product of mere negligence, repeated example of such treatment bespeaks a deliberate indifference by prison authorities to the agony engendered by haphazard and ill-conceived procedures. The series of incidences closely related, in Basemore's case, warrants review.

68. (IV.p) Count V (Due Process and Equal protection) Basemore incorporates by referencing the full body of this complaint for full discussion along with all exhibits affixed hereto.

69. (IV.q) The procedure for facilitating those who have been diagnosed as Gender Dysphoric is a well practiced procedure at SCI-Camp Hill, which is, in

part, a classification center for a substantial portion of the populace that enters Pennsylvania's penal system. Transgender care is a "narrow space" in the Department of Corrections [SCI-camp Hill] health care system. None of the health care personnel [Defendants] who are registered to tend to the treatment of transgender care can lay claim to ignorance as a defense regarding their actions. None of the non-health care personnel [Defendants] can lay claim to ignorance, after reviewing documentation which is passed on from one department to another [chain of command] as a defense for their decision-making.

70. (IV.r) Basemore's final in-house appeal, to Defendant harry prior to seeking, as a last resort, an appeal to Secretary's Office of Inmate Grievance & Appeal [SOIGA], was denied due process and equal protection for the facts which were outlined before them. Defendant Harry's conscious decision to forego Basemore's facts as outlined and placed before them is based, in part, on that which she considered quote: "untimely."

71. (VI.s) Defendant Harry consciously chose to avoid addressing the factual statements of her subordinate [Defendant Nicklow] when they consciously acknowledged to Basemore, (in Basemore's first stage of appeal) that quote: "The available records indicate that the treatment was initiated and in violation of Departmental Policy 13.2.1.." Although there were an availability of "records", the utilizing and sharing of those records, for the sake of assisting* Basemore in her transition, were not carried out. Transgender care is an exacting and stringent protocol in a concise format.

72. (IV.t) Defendant Nicklow, when given an opportunity to implement a remedy*, so as to give a semblance of "correcting"* the harm that was placed upon Basemore, chose not to do so.

73. (IV.t) Basemore's Due Process and Equal Protection rights were further circumvented when Defendant Harry chose not to exercise the inherent option to of

The "assisting" which Plaintiff alludes to is with regard to the appropriate person(s), in accordance with policy DC-ADM 804, section 1- A.(3)(a)(b) and (c)

the grievance policy by remanding Basemore's grievance for reconsideration*, but instead made light of Basemore's issues by collectively labelling them as "untimely" (see Exhibit DC-ADM Inmate Grievance System Procedural Manual; Section 2- Appeals d(5), e. remand (1) through (6).

74. (IV.v) In furthering the violation of Basemore's Due Process and Equal Protection Rights. Basemore's final Appeal to [SOIGA] was responded to outside the guidelines of policy. Defendant Moore [acting Chief Grievance Officer], forward a Grievance Referral (Notice To Inmate) on "11/02/21; 04:18." Basemore allowed five (5) working days for SOIGA to receive their appeal. 10/29/21 was the thirty (30) day window to respond with either a referral or an extension request.

75. (IV.w) (Due Process and Equal Protection)

Basemore incorporates by referencing III. Statement of facts (C) full discussion along with all exhibits affixed hereto int along with all exhibits affixed hereto.

76. Basemore asserts that the policies that were in put in place for SCI-Camp Hill's health care personnel are part of a strict protocol to be followed. In denying Basemore continuous psychological counseling, at such a critical turning point, to say the least, has deprived Basemore the equal protection that's afforded to all (see Exhibit: Mental Health).

77. The early stages of being chemically changed from one physical form into another demands both psychiatric and psychological monitoring for mood swings, dream disturbances, and fear, to name a few (see Exhibit: Mental Health).

78. (IV.x) (Interfering with hormonal therapy once prescribed in violation of Basemore's rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; Eighth Amendment Clause of Cruel and Unusual Punishment, and, Americans With Disabilities Act 42 U.S.C. 12102(2)*

79. Defendant Voorstad's conscious decision to intentionally interfere with

---

* "correcting" and "remedy" in this instance applies to the same above said policy regarding the "appropriate person."

Basemore's hormonal treatment by abruptly/peremptorily removing it without meeting the criteria for cause.

V. <u>INJURY</u>

80. Due to the abrupt/peremptory removal of Basemore's hormonal therapy, for over seventeen (17) months, the removal of diagnosis*, and the removal of Mandatory psychological counseling, notwithstanding having no psychiatric counseling, has led to neuropsychological/physiological/anatomical disturbances all of which contributed to a conversion of symptoms.

81. Emotional lability, on-going stressors due to a lack of coherent cogent treatment plan.

82. Attenuation (atrophy) of Montgomery Glands/aerolae (due to initial treatment stoppage*, and thus disrupting the biochemical, neurological pharmacodynamics and pharmacokinetics of drug-body interaction with the effects of "druglikeness" (oral dose) compounding the cumulative effects of Basemore's emotional lability by augmenting the daily stressors.

83. Having propelled Basemore into the realm of chemical castration*, thus denying Basemore their inalienable right to remain a pro-choice procreant so as to beget future offspring, by denying Basemore the "reproductive health" portion of the consent form, refusal to discuss said portion which outlines birth control options as part of the reproductive health proposal. By denying Basemore sperm cryopreservation, the above cumulative effects has exacerbated Basemore's fears and depression and decimated Basemore's belief that living the best life possible is attainable.

84. Basemore was placed in, and thus remains bound in the high risk category for coinciding complications by being denied the Standards Of care protocol treatment for their age group (40 plus years of age should receive Transdermal Patch (see Exhibit: TAU: Guidelines, and Table 2).

85. Basemore, in being subjected to biochemical, physiological, and cellular disruption of internal organs, as well as overall anatomy, remains a catalyst for

the physio-chemical-neurological harm induced, as well as unknown effects years from now, due to the improper ongoing treatment.

86. Defendant Voorstad, by stopping treatment, reversed the onset of physical change and placed Basemore in a non-progressive depressed state for over seventeen (17) months, compounded by Basemore's discovery of her diagnosis haven been removed* thus stripping Basemore of what they came to believe is her true identity.

87. Basemore, by not receiving Standards Od Care policy's Risk Assessment and Modification for Initiating Hormone Therapy protocol, as part of ongoing harm reduction, has contributed to being unable to have sperm count returned to a healthy reproductive level.

VI. <u>RELIEF</u>

88. Have sperm cryopreservation procedure carried out by a non-DOC source, receive Propecia, Minoxidil, Ensure/Boost, Lipofilling (non-DOC source), monetary relief- compensatory and punitive (Please Note: s specific amount was mentioned in the Initial grievance/appeals).

Dated: 2/14/23

"Respectfully submitted,
S/ _William Basemore_
  William Basemore

CERTIFICATE OF SERVICE

I, _William Basemore_, hereby certifies under the penalty of perjury [28 U.S.C. Section 1746], that on _Tuesday, February 14th 2023_ caused to be served true copies of the foregoing PROPOSED AMENDED COMPLAINT, to the parties listed below by United States, First Class Mail, postage prepaid.

    (1) The Honorable Judge Jennifer P. Wilson
    United States District Court
    Middle District of Pennsylvania
    William J. Nealon Bldg. & U.S. Courthouse
    235 North Washington Avenue
    P.O. Box 1148
    Scranton, PA 18501-1148
(2) Kelly J. Hoke
    Attorney I.D. No. PA 202917
    Pennsylvania Department of Corrections
    Office of Chief Counsel
    1920 Technology Parkway
    Mechanicsburg, PA 17050

S/ _William Basemore_
William Basemore

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| William Basemore | : | Civil Action No. 22-cv-01700 |
| Plaintiff | : |  |
|  | : |  |
| VS. | : | Judge Jennifer P. Wilson |
|  | : |  |
| Theodoor Voorstad, et. al., | : |  |
| Defendants | : |  |

## PLAINTIFFS' BRIEF IN SUPPORT OF

## PROPOSED AMENDED COMPLAINT

Plaintiff, William Basemore, ("Basemore") respectfully requests that this Court grant her Proposed Amended Complaint against both Medical and Non-Medical Defendants of the Department of Corrections,as well as Department of Correction's [DOC Personnel] from the Psychology and Psychiatry Departments at the State Correctional Institution Camp Hill [SCI-Camp Hill]. Basemore asserts that while incarcerated at SCI-Camp Hill she failed to receive policy-controlled transgender care and treatment due to the abrupt/peremptory stoppage of hormonal therapy, the stripping away of her diagnosis, improper hormonal treatment for her age, and Psychological counseling by personnel not having the required qualifying prerequisite certification [Master's Degree] to counsel.

### I. PROCEDURAL HISTORY

Basemore filed, on 10/27/2022, a Complaint against Medical and Non-Medical related Defendants retained and/or employed at the DOC SCI-Camp Hill. On Monday,

January 9, 2022, Basemore submitted to this Court a Motion Seeking Leave To Amend Complaint. Basemore receive an Order from this Court informing her that said motion will be denied <u>with leave to renew... motion with the required attached proposed pleading</u> (see attached exhibit marked: <u>ORDER</u>. By Order of this Court, Basemore now file her Plaintiffs' Brief In Support of Proposed Amended Complaint.

## II. Statement of Facts

Basemore, in her complaint (both Original and Proposed Amended), asserts, inter alia, that after several weeks of psychological counseling with Defendant Matt Grimes, who was assigned to Basemore as her psychologist*, a referral* was made on behalf of Basemore to meet with the medical department before meeting with Defendant Psychiatrist Ademola Bello [Dr. Bello] and being assessed and diagnosed as one having Gender Dysphoria.

Basemore met with Defendant Dr. Voorstad who, after reading aloud the consent form [DC-572] was signed by both Defendant Voorstad and Plaintiff Basemore. Feminizing Hormone Therapy [FHT] treatment was received for twenty (20) days, and, on 8/12/2020 Defendant Voorstad in knowing that the consent form [DC-572] carried only two stipulations for a withdrawal (contraindications and security concerns which were not an issue) chose to abrupty/peremptorily discontinue, as oppose to titrating Basemore's hormonal treatment once, in accordance with policy and common medical practice, it had begun. Exhibit: A and, Exhibit: DC-135A INMATE'S REQUEST TO STAFF MEMBER, dated: 9/7/22.

Basemore understands, through conversation with then assigned psychologist Defendant Grimes, Psychiatrist Mushgaq, the National Commission on Correctional Health Care Board of Directors [NCCHBD] Transgender and Gender Diverse Health Care in Correctional Settings, reaffirmed with revisions November 1, 2020.

Said FHT treatment, not only should it never had been interrupted thus

---

*Defendant Grimes, per their own admission to Plaintiff, does not have a qualifying Master's Degree for practicing psychology.

stopped abruptly, but that it should never had been administered in oral dosage but through Transdermal Formulations.

Defendant Voorstad, through their attorney chose to insinuate that "Basemore was informed that "he" required additional psychological testing and treatment before receiving a diagnosis of gender dysphoria and FHT" in their II. Statement Of Allegations Found In The Complaint, page 2, second paragraph, lines 12, 13, and 14. This is only an insinuation by  them  taken from Basemore's Exhibit: A, Statement of Facts, C. Basemore strongly asserts, no where in her complaint does such exist. They rely on Fact (12), page 4(c) of original complaint which will be expounded upon in the Argument portion of brief).

Basemore asserts that there was a deliberate delay in resuming the FHT.

Basemore asserts that there was deliberate indifference to her serious medical need, in violation of equal protection.

Basemores' complaint is not silent, as attorney for the Defense [Defendant Voorstad and Wellpath] would like for this Court to believe. Again, here, defense attorney insinuates that Basemore's FHT treatment resumed, (being administered orally contrary to Transdermal Formulations for her age group- over forty) February 1, 2022, after "completing 'his' psychological treatment", is another insinuation that adds an element of untruth.

Basemore was informed, by then assigned psychologist Defendant Grimes, that they will no longer be assigned as her psychologist. Basemore's lack of psychological counseling is equal to the February 1, 2022 date.

Basemore remains on orally administered hormones, as oppose to Transdermal Formulations with a second diagnosis of Gender Dysphoria and no psychological counseling on a regular basis.

Basemores' grievance no. 936918, dated July 16, 2021, was filed after Basemore having spoken with CCPM/PREA Manager George Clements*. Said conversation

took place on 6/30/2021 (ten months, two weeks after the date of injury -8/12/20). Said grievance was filed 7/16/21, eleven (11) months after the date of injury. Grievance exhaustion is mandatory, per PLRA Standards, thus time was tolled from 7/16/21 until March 10, 2022, a total of eight (8) months. The date of injury, being within the limits of one (1), is preserved. In addition, the date of Basemore's diagnosis being stripped from her by the Psychiatry Department (8/27/2020), the additional insult to Basemore's injury (diagnosis removal) is ten (10) months and nineteen (19) days, not "nearly a year later" as defendant's have stated in their motion to dismiss.

Lastly, DOC Defendants, both medical and non-medical, have personal involvement* in Basemore's medical and non-medical arguments respectively.

## II. STATEMENT OF FACTS

Basemore asserts that her diagnosis with Gender Dysphoria occurred on July 22, 2020. (see page 4 of 6 original complaint). Basemore, upon meeting with Defendant Voorstad, had consent form [DC-572] read to them by said Defendant, and later signed said form to commence hormonal therapy. Basemore asserts that her hormonal therapy treatment was abruptly/peremptorily removed. (see page 4(b), fact #5). Subsequently, a grievance was files (#936918) in addition to numerous Inmate Request To Staff. Basemore's diagnosis as one with Gender Dysphoria was removed from record(s) (see page 4(b), fact #8). Basemore was made aware, through Defendant Grimes, of said removal of diagnosis. (see page 4(b), fact #11). Basemore went several months without any form of psychological counseling, even though she inquire, with Psychologist Howdyshell about the return of an assigned psychologist and appealing to her to assign someone. (see page 4(c), fact #17). Basemore was presented with a second consent form [DC-572; consent form II) by Defendant Voorstad even though the initial consent form was never nullified. (see page 4(c), fact #20). Basemore asserts that refraining from abrupt stoppage and being titrated as the proper policy-established guidelines dictate. (see page 4(d), fact #39). Basemore asserts that she receives no dietary supplements to retard the atrophy process brought on by hormonal treatment. (see page 4(d), fact 25). Basemore has been deliberately left in a "high risk" category for Venous Thrombembolism [VTE] by being administered oral, as oppose to Transdermal patch for their age group. (see page 4(d), fact 26). Basemore asserts that proper training of medical, psychology, and psychiatric personnel shall be properly trained through their respective vendors. (see page 5(a), fact 46). Basemore asserts that hormonal treatment initiates the onset of chemical castration, biochemical-physiological, transubstantive, atrophic, and depressive effects. (see page 5(a), Count III). Basemore asserts that the appearance of Montgomery

glands, due to physical change, succumbed to atrophy upon hormonal termination. Basemore asserts that cellular, biochemical, and neurophysiological effects are real, observable, tangible, and scientifically proven effects of hormonal treatment that will augment or attenuate one's physical state upon initiating hormonal treatment or abruptly terminating, respectively. (see page 5(c); (IV.i)(IV.k). Basemore asserts that the above mentioned Consent Form(s), in not being upheld to the same standards as any other contract would, were deliberately breached.

III. <u>STATEMENT OF QUESTION</u>

**A.** Should DOC Defendants, both Medical and Non-Medical, be held liable for their personal involvement?
Suggestive Answer: Yes.

**B.** Should Centurion Managed care be held liable for the poor training of the mental health staff, licensed psychologist, managers, licensed psychologist, psychological specialist, psychological services associates, and social workers, as well as responsible for providing an annual training report to the Bureau of Health Care Services [BHCS]?
Suggested Answer: Yes.

**C.** Should WELLPATH be held liable for the poor training of the medical practitioners, as well as for providing and annual training report to the Bureau of Health care Services [BHCS]?
Suggestive Answer: Yes.

# IV. ARGUMENT

\* A. Personal Involvement.

Personal involvement or actual knowledge by the Defendants of the need for medical attention is a prerequisite for 1983 liability predicated on inadequate medical care. A medical Defendant is not just one having one's personal medical history at their disposal for recreational reviewing but but a careful perusing of said document and the state approved guidelines and policies put in place when a need to make medically sound decisions in the treatment for a particular age group of patience, can be deemed, for all intent and purpose, personal involvement. In identifying and showing recurrence between medical Defendants, being the primary caretaker of Plaintiff, is a showing of personal involvement. A medical Defendant shows personal involvement when they chooses a course in treating a patience [Plaintiff] that contradicts the Standards Of Care, policies, and protocol to be followed, thus placing patient [Plaintiff] in a "high risk" category for immediate and future complications, is a show of conscious and blatant disregard for the patient [Plaintiff]. The Standards Of care places value on the "harm reduction approach" when it comes to transgender care.

Medical Defendant Voorstad is required, per policy, to have Standards Of Care guidelines readily accessible (UpToDate is DOC required, World Professional Association for Transgender Health [WPATH] is also utilized by the DOC as guidelines). Defendant Voorstad knew, without having to defer and consult with Defendant Bello, that abrupt stoppage is universally unacceptable when administering any type of drug treatment, thus was an act of personal involvement on their part, being dealt to

*13.2.1, Access to Health Care Procedures Manual, Section 19- Diagnosis and Treatment of Gender Dysphoria, A. Departmental Responsibilities, (1) The Dept. Chief Psychiatrist shall have overall responsibility for the mental health diagnosis an treatment of inmates diagnosed with [GD]. (2) The Dept. Chief of Clinical Services shall have overall responsibility for the medical treatment of inmates diagnosed with [GD]. (4)(c) The GD Treatment Review Committee shall assist the sites, if requested with the diagnosis, treatment, and management of challenging cases.

Plaintiff but chose to do so nonetheless. (Saunder v. Horn 959 F. Supp 689; 1996 U.S. DIST LEXIS 21497. Medical doctors and experts alike have agreed that once hormone therapy has begun it should only be terminated by gradually tapering it, and not by halting it peremptorily. Torey Tuesday South v. Gomez 2000 U.S. App. LEXIS 14915, 9th Cir.). Suggestive case law as our neighboring state has ruled on this issue brought before their district, as Plaintiff is doing so within her amended complaint today, is seeking for this Court to follow in the above said neighboring decision which was made. The U.S. Const. amend. VIII forbids not only deprivation but interfering with treatment. Todaro v. Ward, 565 F2 48565 F.2d 48; 1977 U.S. App LEXIS 109851977 U.S. App LEXIS 10985. Medical Defendant(s) did not commit just one omission in Basemore's transgender care and treatment but multiples.(see Initial Grievance Response, by Defendant Nicklow and Heist, in which it was aggrieved by both Defendants that "all these steps were not followed." A refusal to communicate with Basemore regarding the birth control option. Defendant Voorstad deliberately initiated chemical castration for Basemore. Chemical castration implicates a liberty interest, and Natural Liberty is a right inherent at birth (the right to procreate). In Norsworthy v. Beard, 87 F. Supp. 3d 1104; 2015 U.S. Dist. LEXIS 44595, the ninth circuit, a defendant may be held liable as a supervisor under 42 U.S.C.  1983 if there exist either (1) his or her personal involvement in the constitutional deprivation or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.

Basemore did not seek to have non-medical defendants [Nicklow, Heist] to weigh in on a form of complex treatment that which exceeds or is beyond their (1) training and (2) job capacity. Per policy, Basemore's medical related matter should had been referred to the appropriate person (see DC-ADM 804, Inmate Grievance System Procedures Manual, Section 1- Grievances & Initial Review A.3c;

page 8 of 12

see also Grievance Referral (Notice To Inmate) dated 11/02/2021, in which soliciting input from an "appropriate" Central Office Bureau, is mentioned; see also SOIGA's acknowledge receipt comment/action taken, dated 02/22/22. Although non-medical Defendants cannot be considered deliberately indifferent in failing to respond to medical complaints of a prisoner already under treatment by the prison's medical expert, a medical Defendant can and should. Burnside v. Moser, 138 Fed. App'x 414, 416 (3d Cir. 2005). Basemore was never seeking a favorable response to be provided to be provided to them by non-medical Defendants. Basemore sought to have those non-medical Defendants [Nicklow and Heist] to be aware of the policy that dictates that grievance issues should be, according to policy, directed towards the appropriate person (i.e. one having a working medical knowledge of their medical issues). While a single omission or a single delay, viewed in isolation, may appear to be the product of mere negligence. Repeated examples of such treatment bespeaks a deliberate indifference by prison authorities to the agony engendered by haphazard and ill-considered practices. It was noted in Lanzaro, 834 F.2d at 346 that where "knowledge of the need for medical care [is accompanied by the]... intentional refusal to provide the care' or where "short of absolute denial... 'necessary medical treatment is... delayed for non-medical reasons," or where short of absolute denial... 'necessary medical treatment is... delayed for non-medical reasons," or where "prison authorities prevent an inmate from receiving recommended treatment." Under such circumstances, it could be concluded as a matter of law that Defendant Voorstad's conduct did run afoul of the Lanzaro standard.

The physiological, which is defined as characteristics of or in accord with the normal and healthy functioning of a living organism, in Basemore's case, was disrupted by both abrupt stoppage of hormonal treatment and the stripping away of her diagnosis. The American with Disabilities Act list a physiological disorder

or condition affecting the musculoskeletal system as an example of a "physical impairment." (42 U.S.C. 12102(2). A prison inmate has the right under the Eighth Amendment to be free from deliberate indifference to serious physical or psychiatric needs. Grossly incompetent medical care or choice of an easier but less efficacious course of treatment of an inmate can constitute deliberate indifference for analysis under U.S. Const. amend VIII. Physiology is a life science of the biological functioning of an organism. Defendant WellPath is an essential component of Basemores' civil action due to their contracting agreement with DOC SCI-Camp Hill.

Defendant Harry, a non-medical Defendant, cannot be excused from Basemores' civil action when personal involvement is evident. Jerry v. Francisco, 632 F2d 252; 1980 U.S. App. LEXIS 13134. Defendant Harry, much like Defendant Nicklow and Heist, were not the appropriate person to weigh-in on Basemore's medical issues. However, Defendant Harry, in being the Warden, although under obligation to review Basemores' second stage of in-house appeal, chose not to remand it to an appropriate person. If such had been done defendant Harry, upon receiving said appeal, could had deferred her final decision based on the appropriate person who has knowledge in the space of transgender care. The liability of supervisory prison personnel  under  1983 turns on whether the prisoner complains about a sporadic incident, which may be beyond the control of a supervisor, or about general conditions and policies properly within the supervisory purview of the officer in charge of the prison.

Just as Basemore's transgender care and treatment issues were reviewed and, it was determined that a need to solicit input from an appropriate Central Office Bureau. Defendant Harry, in having an elite position as Facility Manager, could have sought out one who was knowledgeable in the space of transgender care and treatment (i.e. said guidelines in policies governing transgender care) and assigned someone. Personal involvement can be shown through allegations of personal direction or actual knowledge and acquiescence. Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995).

**B. Centurion Managed Care [Contracted Mental Health Vendor] responsibility to supply obligatory annual training reports to the Bureau of Health Care Services.**

Centurion Managed Care, although not mentioned by name in Plaintiff's grievance, appeals, and initial complaint (because said name was not available to Plaintiff at those times), are nonetheless mention, however indirectly, through the named Defendants whom are suppose to receive training via annual training reports distributed to the Bureau of Health Care Services [BHCS], whom are mentioned throughout Plaintiff's grievance/appeals and initial complaint. Policy 13.2.1, Access to Health Care Procedures Manual, Section 19- Diagnosis and Treatment of Gender Dysphoria (see page 19-1 and 19-2, (A) Departmental Responsibilities and (B)(C) Diagnosis of GD and Training attached), clearly outlines that which is obligatory and to whom the obligations fall upon. Centurion Managed Care's obligations are, in part, **training.** Centurion Managed Care's poor training exceeded poor training when Defendant Matt Grimes, representing the psychology department was allowed to practice "psychology" without having a qualifying Master's Degree. Such practices by the Psychology Department now calls into question other inter-departmental personnel with regard to titles, rank, and academically certified qualifications. Centurion Managed Care, due to the level of involvement, which falls under contract, are liable, and thus relevant to Plaintiff's civil action.

**C. WELLPATH [Contracted Medical Vendor] responsibility to supply obligatory annual training reports to the Bureau of Health Care Services**

WELLPATH, although not mentioned in Plaintiff's grievance, appeals, and initial complaint (because said name was not available to Plaintiff at those times) are nonetheless mentioned, however indirectly, through the named Defendants whom are suppose to receive training via annual training reports

distributed to the Bureau of Health Care Services [BHCS], whom are mentioned throughout Plaintiff's grievance/appeals, and initial complaint. Policy 13.2.1, Access to Health Care Procedures Manual , Section 19- Diagnosis and Treatment of Gender Dysphoria (see page 19-1 and 19-2, (A)_ Departmental Responsibilities and (B)(C) Diagnosis of GD and Training attached), clearly outlines that which is obligatory and to whom the obligation falls upon. WELLPATH'S obligations are, in part, training. WELLAPTH'S poor training, due, in part, to the numerous omissions in procedural steps for proper treatment of one diagnosed with Gender Dysphoria, now calls in to question other inter-departmental personnel with regard to the training "manual" of WELLPATH. WELLPATH, due to their level of involvement, which falls under contract, are liable, and thus relevant to Plaintiff's civil action.

Dated: 2 / 14 / 23                    S/ *Wm Bas*
                                          William Basemore

## CONCLUSION

For the above said reasons Plaintiff prays that this Court grants her Proposed Amended Complaint and Plaintiffs' Brief In Support Of Proposed Amended Complaint.

Dated: 2/14/23

"Respectfully submitted,

S/ _William Basemore_

William Basemore

CERTIFICATE OF SERVICE

I, _William Basemore_, hereby certifies under the penalty of perjury [28 U.S.C. Section 1746], that on _Tuesday, February 14th 2023_, caused to be served true copies of the foregoing PLAINTIFFS' BRIEF IN SUPPORT OF PROPOSED AMENDED COMPLAINT, to the parties listed below by United States, First Class Mail, postage prepaid.

(1) The

Honorable Judge Jennifer P. Wilson
 United States District Court
 Middle District of Pennsylvania
 William J. Nealon Bldg. & U.S. Courthouse
 235 North Washington Avenue
 P.O. Box 1148
 Scranton, PA 18501-1148

(2) Kelly J. Hoke
 Attorney I.D. No. PA 202917
 Pennsylvania Department of Corrections
 Office of Chief Counsel
 1920 Technology Parkway
 Mechanicsburg, PA 17050

S/ _William Basemore_
William Basemore

EXHIBIT: STATEMENT OF FACTS (from Plaintiffs' Initial Complaint)

(Continuation of **III. STATEMENT OF FACTS (C)**):

Fact (5) Plaintiff, on 8/12/20, had their Hormone Replacement Therapy abruptly/peremptorily removed minus any evidence and/or information being discussed or shown in documented format to Plaintiff regarding contraindications or security concerns. Plaintiff immediately submitted Inmate Request to assigned Psychologist Grimes, followed by an Inmate Request to then Prison Rape Elimination Act [PREA] Compliance Manager Kendall regarding the sudden stoppage. Plaintiff met with assigned Psychologist Grimes who made it known to Plaintiff that, due to a lack of communication between departments, treatment has been stopped because: Quote: "Somebody dropped the ball" (see Exhibit: B1, B2 (reverse side), and B3).

Fact (6) Plaintiff, on 8/14/20, submitted a second Inmate Request to then PREA Compliance Manager Kendall informing her, in part, about concerns regarding the unforeseen occurrence which unfolded, as well as seeking to know the name of the Psychiatrist who made the assessment and diagnosis of Plaintiff (see Exhibit: C).

Fact (7) Plaintiff would later meet with defendant Voorstad at which time Plaintiff appealed to defendant to reinstate said treatment. Defendant's response to Plaintiff (as noted in Plaintiff's Initial Grievance) was as follows: "If we do it for you we'll have to do it for everyone."

Fact (8) On 8/27/20, Plaintiff's diagnosis, as one having Gender Dysphoria (as assessed by Psychiatrist Ademola Bello), was removed.

Fact (9) Plaintiff, on 12/14/20, sent an Inmate request to then PREA Compliance Manager Kendall regarding a need to speak with assigned Psychologist Grimes, in part concerning Plaintiff's desire to have an Orchectome (see Exhibit: D).

Fact (10) Plaintiff, on 12/22/20, sent an Inmate Request to Psychologist Howdyshell expressing the need to speak with their assigned Psychologist [Grimes] (see Exhibit: E).

Fact (11) Plaintiff, in the month of April of the year 2021, met with assigned Psychologist Grimes. Plaintiff was made aware of their assessment and diagnosis,

by Psychiatrist Bello, as one being placed under the classification of Gender Dysphoric, as being removed.

Fact (12) Plaintiff, on 9/23/21, met with the Psychiatric Review Team [PRT], consisting of Site Psychiatrist Mushtag, Site Psychologist Stein, Assigned Psychologist Grimes, Unit Manager Digby, and Counselors Arnold and Fagnani. Plaintiff's Gender Dysphoric condition was "re-established" by Site Psychiatrist Mushtag.

Fact (13) On 10/4/21, Plaintiff was scheduled to meet with the Medical Department. Said meeting never took place.

Fact (14) On 10/5/21, Plaintiff was scheduled to meet with the Medical Department. Said meeting never took place.

Fact (15) Plaintiff, on 10/22/21, submitted an Inmate Request to Corrections Health Care Administrator [CHCA] Beth herb. Plaintiff informed defendant Herb about the PRT meeting and that steps were taken to restart hormone therapy (see Exhibit: F).

Fact (16) Plaintiff, on 10/22/21, sent an Inmate Request to Psychiatrist Mushtag informing her that another month has passed and hormone therapy had not resumed. Plaintiff inquiry was for the sake of coming into knowing who they could write to for answers regarding the unnecessary and extended delay. (see Exhibit: G)

Fact (17) Plaintiff, for several months, has had no mental health sessions with (a twice a year evaluation, every six months) with any Psychologist. Plaintiff made an inquiry to Psychologist Howdyshell several months ago to know (1) will assigned Psychologist return and, if not, (2) please assign someone.

Fact (18) Per policy (NCCHC, WPATH, UpToDate, etc), Plaintiff is entitled to competent, clinically trained, licensed, knowledgeable, and culturally competent mental health professional personnel.

Fact (19) Plaintiff has had no contact with a Psychiatrist since 9/23/21.

Fact (20) Plaintiff, in a weakened and distraught state, was able to be misled by defendant Voorstad into signing, even after questioning its purpose, being that the original consent form was never nullified, a second consent form if I want to receive hormone treatment.
(see Exhibit: Consent Form II)

Fact (21) Under the Guidelines of the 13.2.1 Access to Health Care Procedures Manual; Section 19- Diagnosis and Treatment of Gender Dysphoria (C.) **Training**, Paragraph (1) and (2), the Registered Nurse, as the Mandatory language of the above said policy dictates for the training of staff, must be a Psychiatric Certified Registered Nurse Practitioner [PCRNP]. (see Exhibit:Prerequisite and--) Said individual shall have specific prerequisites and qualifications. In addition to a background as a Registered Nurse [RN] being required, a two-year associate degree in nursing, a three-year hospital-based nursing diploma, or a four-year bachelor's degree at a college or university in acquiring the extensive knowledge of nursing, mental health assessment and diagnosis, Psychotherapy, and Psychopharmacology. (see Exhibit: Prerequisites and Qualifications)

Fact (22) Current protocols dictate a refraining from abrupt stoppage of hormone therapy but not the obverse- being titrated and stepped down (see Exhibit: DC-135A INMATE'S REQUEST TO STAFF MEMBER dated: 9/7/22).

Fact (23) In being properly titrated and stepped down, as recommended, may lead to a reduced risk of an increase in blood pressure which may lead to a heart attack or stroke, especially for one who has a family history of cardiovascular complications.

Fact (24) Although Plaintiff, a non-smoker, (smoking combined with estrogen usage creates complications- risk of blood clots, stroke, heart attack) is not exempt from above said complications.

Fact (25) Muscle atrophy (decrease in muscle mass/strength) will be progressive due to lifelong usage. Dietary supplement such as Ensure/Boost (something Plaintiff is not currently receiving), coupled with exercise, which Plaintiff is receiving, counterbalances muscle lost and strength.

Fact (26) Plaintiff is being deliberately left in the "high risk" category for Venous Thromboembolism [VTE] by being administered oral, as oppose to Transdermal patch for their age group (see Exhibit: RISK OF HORMONE THERAPY).

patients [TAU-Translational Andrology and Urology, policy 13.2.1, Access to Health Care procedures Manual; Section 19- Diagnosis and Treatment of Gender Dysphoria, as well as UpToDate, a propriety online software program, were followed by SCI-Camp Hill's health Care Personnel.

Fact(46) The practitioners who specialize in transgender care, in addition to being mandated to having a current subscription to the above said online program, must be properly trained by the Contracted Medical Vendor [CMV]. Psychiatrists, Psychiatric Certified Registered Nurse practitioners, Licensed Psychologist Managers, Licensed Psychologist, Psychological Services Associates, and Social Workers shall be properly trained by the Contracted Mental Health Vendor [CMHV]. The above said vendors shall provide an annual training report to the BHCS.

(IV.a) Defendant Beth Herb's job capacity as CHCA is, in part, a primary channel for the communicating of information from sub-departments (medical personnel) and Administrative personnel outside, although connected to her department. In addition, defendant Herb must be cognizant regarding the evaluations generated by the Psychiatry, Psychology, and Medical departments so as to compile the three evaluations for Individual recovery Plan [IRP] approval. Defendant Herb must relay the evaluations to the BHCS in which the Gender Dysphoric review Committee [GDRC] shall initiate a vote sheet [DC-542] for approval. The IRP shall be returned to the CHCA as either approved, or with recommendations.

(IV.b) Transsexualism, which includes several sub-categories (psychiatric, Psychological, and Medical, in part) is a very complex phenomenon, and thus presents both serious and special needs.

(IV.c) **Count II** (Deprivation of Medical Treatment: In Violation of Eighth Amendment U.S. Constitution; Eighth Amendment Deliberate Indifference To Serious Medical Needs).

(IV.d) Plaintiff incorporates by referencing III. **Statement of Facts (A)**, full discussion within the body of facts of this Complaint along with all exhibits affixed hereto.

The defendants which comprise the Contracted Medical Vendor [CMV] and the Contracted Mental Health Vendor [CMHV] are liable for the the harm done to Plaintiff due to their poor training and supervision of the Health Care Personnel who, in their job capacity, are required to perform an unique service on a small population that is listed under the title of transgender care (see Exhibit: Training )

(IV.i) Defendant's deliberate indifference to Plaintiff's serious medical needs broadens when they failed to take into account the level of harm of the physiological reversing of biochemical and cellular anatomical components both immediate and long term future effects of taking medications that are clearly marked in bold **Hazard Drug.** (see Exhibit: Interruption/Reversal)

All medications have side effects. However, Estradiol (Estrace) and Spironolactone have a Pharmacodynamics and Pharmacokinetics which places them beyond the realm of ordinary aspirin. The known physical effects are, in part, Neurophysiological, Biochemical, Cellular, all, of which being physical manifestations, culminate in the form of gross physical changes.

(IV.j) Deliberate indifference is met when there are no showings of contraindications (health/security related) which could, possibly, warrant the removal of treatment. In having the abrupt stoppage coupled to an unnecessary 17.3 month delay mentally and psychologically removed Plaintiff from a stage of believing that an improvement of their quality of life was finally in motion to one that is now comorbid, returning to bouts of depression and hopelessness.

(IV.k) Plaintiff experience with the appearance of Montgomery Glands, only to have them fall victim to atrophy, the decrease of sperm count and production with the possibility of not returning to a level that would return Plaintiff to the level of being a procreant, is the equivalent of chemical castration if birth control options [sperm freezing] is not immediately implemented, due in part to the return of hormone therapy (which was never acknowledged in the Final Appeal Response- there's no resolution mentioned in the Final Appeal Response, just a "tossing of the ball" back into "practitioner's hands"), although improperly administered for Plaintiff's age group, does nothing other than metamorphoses Plaintiff into a transmogrification of their current self. (see Exhibit: Reproductive Health) (Count III; IV.g-IV.k constitutes cruel and unusual punishment)

(IV.l) **Count IV** (Maladministration and the need for Mandatory Special needs

topics. They are also responsible for the continual evaluation of a patient's treatment plan and for finding alternate solutions as new challenges arise.

## Prerequisites and Qualifications

A psychiatric nurse practitioner is an advanced medical specialist requiring an extensive knowledge of nursing, mental health assessment and diagnosis, psychotherapy, and psychopharmacology. A background as a registered nurse (RN) is required, along with a two-year associate degree in nursing, a three-year hospital-based nursing diploma, or a four-year bachelor's degree at a college or university. Graduates may then establish a specialization in mental health by pursuing a focused master's or post-master's certificate program. In this course of study, they will delve deeper into the skills needed for a career in this specialization. Accredited certifications, such as the American Nurses Credentialing Center (ANCC) Psychiatric–Mental Health Nurse Practitioner Board Certification (PMHNP-BC), are required for many professional positions. This credential is awarded to those who meet education and experience requirements and pass a certification examination.

## Opportunities for Career Advancement as a Psychiatric Nurse Practitioner

According to the U.S. Bureau of Labor Statistics, the overall employment of nurse practitioners is projected to grow 31 percent from 2016 to 2026. As mental health awareness continues to rise and with individuals, families, and communities who live with mental illness seeking help, opportunities for psychiatric nurse practitioners will continue to grow as well. Psychiatric nurse practitioners work in a variety of settings, including psychiatric hospitals, independent practices, assisted-living facilities, and mental health centers. There are many other unique roles available to psychiatric nurse practitioners with advanced degrees and experience, such as university nurse educator, psychotherapist, and psychiatric primary care provider.

Nurse practitioners are continuing to take on more varied roles in health care. Within the mental health field, psychiatric nurse practitioners perform a wide range of duties that help patients cope with mental health issues. Well-educated and experienced nurse practitioners have the necessary tools to make positive advances in the mental health of their patients, while promoting mental health awareness among individuals and communities across the nation.

## Learn More

Psychiatric mental health nurse practitioners play a significant role in the modern health care system. Our online post-master's certificates can help you develop your communication and therapeutic skills so you can assess, diagnose, manage, and treat mental illness across a variety of populations.

## B. Diagnosis of GD

1. GD is a condition formally recognized and described by the American Psychiatric Association in the current version of the *Diagnostic and Statistical Manual of Mental Disorders,* 5th edition, (DSM-5), APA 2013.

2. The DSM-5 provides diagnostic criteria to consider when evaluating for the presence of this condition.

3. There are two required criteria that must be present for the diagnosis of GD:

   a. the finding of "a marked incongruence between one's experience/expressed gender and assigned gender, of at least six months duration…" (DSM-5, p. 452); and

   b. that "the condition is associated with clinically significant distress or impairment in social, school (for children)/occupational (for adults), or other important areas of functioning" (DSM-5, p. 452). It will be the primary responsibility of the Site Psychiatrist to establish this diagnosis.

## C. Training

[ C M V ]

1. It shall be the responsibility of the contracted medical vendor to train its practitioners.

[ C M H V ]

2. It shall be the responsibility of the contracted mental health vendor to train the mental health staff (psychiatrists, psychiatric certified registered nurse practitioners [PCRNPs], licensed psychologist managers [LPMs], licensed psychologists [LPs], psychological services specialists [PSSs], psychological services associates [PSAs], and social workers) who shall be involved in the diagnosis and treatment of transgender patients.

3. The training shall be specific to the evaluation, treatment, and management of patients with GD, and may involve professional meetings, group seminars, or individual presentations by experts in the field.

4. Refresher training shall be provided on a yearly basis.

5. The training must be pre-approved by the Department Chief Psychiatrist, or the Department Chief of Clinical Services, as appropriate.

6. The respective medical/mental health contracted vendors shall provide an annual training report to the Bureau of Health Care Services (BHCS).

Issued: 5/23/2016
Effective: 5/30/2016

EXHIBIT: H (grievance and appeals)

DC-804
Part 1

## COMMONWEALTH OF PENNSYLVANIA
## DEPARTMENT OF CORRECTIONS

| FOR OFFICIAL USE |
| --- |
| _____ |
| GRIEVANCE NUMBER |

**OFFICIAL INMATE GRIEVANCE**

| TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: | DATE: |
| --- | --- | --- |
| Ms. Hester | SCI-Camp Hill | 7/16/21 |

| FROM: (INMATE NAME & NUMBER) | SIGNATURE OF INMATE: |
| --- | --- |
| William Baskmore AS-0436 | William Baumer |

| WORK ASSIGNMENT: | HOUSING ASSIGNMENT: |
| --- | --- |
| Block wor K-2 | N (B2-55) |

INSTRUCTIONS:
1. Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any action you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-804 form and one one-sided 8½" x 11" page). State all relief that you are seeking.

On 6/30/21 (Wednesday morning), Mr. George Clements [CCPM] came to November Block [N-Block] to meet with grievant (meeting took place in Counselor Arnold's office, minus Counselor Arnold's presence). During that meeting Mr. Clements brought the following to grievant's attention: (Quote from Mr. Clements: 'Starting you early was a mistake' now, we're going to go through the proper channels and start the process again.' Although grievant met all the necessary prerequisites before staring Feminizing Hormone Therapy [FHT] treatment (evaluation by Dr. Voorstad, so as to rule out or address anything that would contraindicate treatment. Grievant went through Psychological Counseling with grievant's assigned Psychologist [Mr. Grimes], Psychiatric Assessment/Diagnoses by Psychiatrist Bello, and, the reading aloud of the consent form and the signing by grievant and then Dr. Voorstad), this debacle, which      Mr. Clements called "...a mistake", remains chock-full, and now rest upon the very precipice of augmenting said mistakes by attempting to take grievant through a repeat, a second process, when the initial consent form that was signed by both grievant and Dr. Voorstad and received an     "AuditDateAndTime under the User Name 'Voorstad, Theodoor, MD' on DC-572 Informed Consent for Feminizing Hormone
(page 1 of 2)

B. List actions taken and staff you have contacted, before submitting this grievance.

Mr. George Clements [CCPM]

Your grievance has been received and will be processed in accordance with DC-ADM 804.

_____          _____
Signature of Facility Grievance Coordinator                  Date

WHITE Facility Grievance Coordinator Copy     CANARY File Copy     PINK Action Return Copy
GOLDEN ROD Inmate Copy

(Continuation: page 2 of 2)

Therapy form, which was followed by approximately three (3) weeks of hormone therapy, remains obligatory.

Dr. Voorstad's justifying response to grievant, for not continuing grievant's initial hormone treatment was as follows: (Quote from Dr. Voorstad: "If we do it for you we'll have to do it for everyone." The consent form states clearly in the very first sentence of the first paragraph on the very first page that: This informed consent form refers to the use of estrogen and/or androgen antagonist (sometimes called "anti-androgens" or "testosterone blockers") BY PERSONS WHO HAVE BEEN DIAGNOSED WITH GENDER DYSPHORIA..."

Grievant was prescribed and was given and consumed, for approximately three (3) weeks, the above said Pharmaceutics. There were no health or safety reasons for the termination of grievant's Feminizing Hormone Therapy [FHT] treatment.

Grievant was prescribed Pharmaceutics designed to alter them Neurophysiologically, emotionally and ultimately physically. Spironolactone and Estradiol were given in conjunct orally, as oppose to Spironolactone preceding Estradiol by 4-8 weeks and then followed by Estradiol via Transdermal route at 0.1-0.4 mg. twice weekly for those over forty years of age. The improper actions taken by Dr. Voorstad, the removal of said hormones, left grievant having to try and make sense of the negative effects of the unexpected abrupt stoppage. Grievant's acquiescence in believing that proper protocol in helping them through transition towards a more refined state of womanhood, turned out to be nothing more than a ruse played out due to grievant's emasculated position, all of which is Eighth Amendment unacceptable.

Grievant maintains that in accordance, and under the directive of, DC-ADM-804 Inmate Grievant System, III. Policy, grievant files this grievance with no ill intent. To the arbiter(s) who will rule on this solemn matter, regardless of the level of appeal that will be needed in order to receive what grievant sees as proper adjudication, ask that no harassment, be it verbal, physical, Psychological, or an other form of "expressions" which can be deemed, by a layperson as harassment (fabricating erroneous misconducts, "cell tossing", sudden removal from job, block or sudden transfer [Section 2-Appeals B(1), be forthcoming in order to prevent exacerbating this apparent maltreatment of grievant through the said actions, of which are modeled by the said acts/instances of improper procedure, and unethical conduct from a professionally held position. Grievant was initially allowed to transition "socially" and receive medical therapy together, only to have hormone therapy abruptly removed and placed on a one year suspension of hormones. And now, one year has elapsed and, the time for revisiting Feminizing Hormone Therapy [FHT] is Now. Grievant's signature, along with Dr. Voorstad's signature, constitutes both parties acknowledgment and understanding of the information contained in the consent form. Grievant acknowledges, per signing the consent form, which Dr. Voorstad witnessed and co-signed, that grievant has completed the necessary steps as outlined in the HBHC Hormone protocol, otherwise there would not had been an informed consent witnessed by Dr. Voorstad and, there would not had been a dispensing of Neurophysiological-altering hormones.

Remedy Sought: (1) Proper Feminizing Hormone Therapy [FHT] treatment for my age group, (2) Finasteride (1mg daily and Topical Minoxidil), (3) Ensure (for the first two years of treatment), (4) Transfer to SCI-Phoenix (to pursue college course via Villanova), and (5) Monetary compensation in the amount of Seventeen million dollars. Thank you.

William Rosenne

Date: 7/16/21   AS-0426

K-55



**Initial Level Extension**

SCI Camp Hill
2500 Lisburn Rd
Camp Hill, PA, 17001-8837

08/11/2021 04:47

| Inmate Name: | BASEMORE, WILLIAM | DOC #: | AS0426 |
| --- | --- | --- | --- |
| Facility: | Camp Hill | Unit Location: | N / B2 |
| Grievance #: | 936918 | | |

In accordance with the provisions of DC-ADM 804, Inmate Grievance System policy, this notification provides notice that staff requires an extension for responding to your grievance.

**Action:**

Notice of Staff Extension – This serves as written notification that an extension is necessary in order to appropriately investigate and respond to your grievance (or appeal). Staff has been authorized to extend the response time by 10 additional working days.

**Comments:**

| Signature: | *Heist* |
| --- | --- |
| Name: | Heist |
| Title: | Facility Grievance Coordinator |
| Date: | 8/11/21 |

cc: Facility Grievance Coordinator
    DC-15

**DC-ADM 804, Inmate Grievance System Procedures Manual**

**Section 1 - Grievances & Initial Review, Attachment 1-E**

AS0426     Grievance #:936918

BASEMORE, WILLIAM

Issued: 1/26/2016  Effective: 2/16/2016

Page1 of 1

B-55



**Initial Review Response**

SCI Camp Hill
2500 Lisburn Rd
Camp Hill, PA, 17001-8837

08/12/2021 04:22

| | | | |
|---|---|---|---|
| **Inmate Name:** | BASEMORE, WILLIAM | **DOC #:** | AS0426 |
| **Facility:** | Camp Hill | **Unit Location:** | N / B2 |
| **Grievance #:** | 936918 | | |

This serves to acknowledge receipt of your grievance to the assigned Grievance Officer. The response is as follows:

**Decision:Grievance Denied**

It is the decision of this Grievance Officer to uphold, deny, or uphold in part/deny in part the inmate's initial grievance. This response will include a brief rationale, a summary of the conclusion, any action taken to resolve the issue(s) raised in the grievance, and the relief sought.

**Response:**

I am in receipt of your grievance in which you allege that you were improperly removed from "Feminizing Hormone Therapy". After reviewing all relevant documentation and interviewing involved staff, I have determined that you were appropriately discontinued from the treatment. The available records indicate that the treatment was initiated prematurely and in violation of *Departmental Policy 13.2.1, Access to Health Care Procedures Manual, Section 19 – Diagnosis and Treatment of Gender Dysphoria*. The Gender Dysphoria Review Committee (GDRC), chaired by the Department's Chief Psychiatrist, must review and approve each Individual Recovery Plan. All of these steps were not followed prior to initiating the Feminizing Hormone Treatment protocol. While it is clear that you completed the informed consent documentation, that is not the final step of authorization to initiate the therapy. It will be ensured that your case will continue to be reviewed, up to and including approval or denial of the process, which is at the discretion of the GDRC. This grievance and any requested relief is denied.

| | |
|---|---|
| **Signature:** | |
| **Name:** | W. Nicklow |
| **Title:** | DSCS |
| **Approver:** | T. Heist |
| **Date:** | 8/12/21 |

CC:  Facility Grievance Coordinator
      DC-15

---

<u>THIS IS AN APPEAL OF GRIEVANCE NUMBER 936918 TO SUPERINTENDENT LAUREL HARRY.</u>
The basis for this appeal rest solely on the decisions of W. Nicklow [DSCS] and T. Heist (Approver) in making a conscious decision to not address said grievance in its totality. The gravitas of the pertinent facts, which make up the body of the Initial grievance, was, for reasons unknown to grievant, answered without addressing <u>all</u> relevant issues contained here nor the ramifications that come from their inequitable decision. The relevancy of the facts hereinafter were laid out with both clarity and concision.   William Basemore now takes this opportunity to appeal to the esteemed wisdom of Superintendent Laurel Harry in hope of receiving a ruling that will be both indicative and   reflective of their exercising unbiased judgment.

It is believed, at this stage of appeal, at least by W. Nicklow and T. Heist, that their partiality towards the totality of these facts   somehow overshadows the gravitas involved here. W. Nicklow states in their response to grievance #936918 the following: "The available records indicate that the treatment was initiated prematurely and in violation of Department Policy 13.2.1, Access to Health Care Procedures Manual, Section 19-Diagnosis and Treatment of Gender Dysphoria." Although W. Nicklow acknowledges the Health Care Department's violation of their own policy. They failed to admit that William Basemore  was harmed by said violation and uphold grievance #936918 *(denial of relief)*

W. Nicklow, in their response also states: "...you were appropriately discontinued from the treatment." Appropriately meaning that it was suitable, correct, befitting, and helpful towards the violators who, by their actions, caused William Basemore serious harm.            " W. Nicklow, again, goes on to say  in their Initial Review Response: "All" of these steps were not followed prior to initiating the Feminizing Hormone Treatment protocol." W. Nicklow makes it very clear that several steps were not followed. However they failed to state that William Basemore is the patient, the victim, not the violator of <u>"All these steps..."</u>

Dr. Ademola Bello [Site Psychiatrist] received information from both the medical department and Psychology Department. They assessed, diagnosed, and made a referral <u>back to medical</u>. During all their communicating, is it to be believed that no one was aware of <u>"All of these steps were not followed"</u>, as W. Nicklow, who, "After reviewing all relevant documentation and interviewing staff,...", that these departments were unprofessional/careless in  their assigned duties? <u>Yes.</u> Mr. Clements acknowledged that it was: "a mistake...". W. Nicklow's above

*page 1 of 2*

(continuation: page 2 of 2)

said acknowledgment of wrongdoing is apparent. The lack of communication between departments is obvious.

(1) William Basemore did not write the prescription for Neurophysiological, emotional and physically altering Pharmaceutics. (2) William Basemore was maladministered Pharmaceutics, contrary to their age group, as well as all the other infractions mentioned in the initial grievance. The systemic defects in the Health Care's Chain of Command and the harm done has now culminated to a point that the matter is unmanageable unless placed in the hands of a Higher Jurisdiction.

Remedy Sought: (1) Reinstating grievant's Feminizing Hormone Therapy treatment in the proper manner for grievant's age group, (2) Finasteride (1mg and Topical Minoxidil), (3)Ensure (for the first two years of treatment), (4) Transfer to SCI-Phoenix (to pursue college course via Villanova), and (5) Monetary compensation in the amount of Seventeen million dollars. Thank you.

William Basemore

AS-0426

Date: 8/17/21



# Facility Manager's Appeal Response

SCI Camp Hill
2500 Lisburn Rd
Camp Hill, PA, 17001-8837

B55

09/01/2021 08:29

| Inmate Name: | BASEMORE, WILLIAM | DOC #: | AS0426 |
|---|---|---|---|
| Facility: | Camp Hill | Unit Location: | N B2 |
| Grievance #: | 936918 | | |

This serves to acknowledge receipt of your grievance appeal to the Facility Manager for the grievance noted above. In accordance with the provisions of DC-ADM 804, "Inmate Grievance System Policy", the following response is being provided based on a review of the entire record of this grievance. The review included your initial grievance, the Grievance Officer's response, your appeal to me and any other documents submitted.

## Decision: Uphold Response

It is the decision of this Facility Manager to uphold the initial response, uphold the inmate, dismiss, or uphold in part/Deny in part. This response will include a brief rationale, summarizing the conclusion, any action taken to resolve the issue(s) raised in the grievance and your appeal and relief sought.

**Response:**

I am in receipt of your appeal and have reviewed your original grievance as well as the Grievance Officer's response. In your appeal, you claim that you filed this appeal based on the decisions of Deputy Nicklow and Ms. Heist. You provide a lengthy explanation regarding your treatment being prematurely initiated, Mr. Clements admitting there was a mistake, and Deputy Nicklow acknowledging a violation of policy and stating your treatment was appropriately discontinued, yet he did not uphold the grievance. Lastly, you claim that Dr. Bello received information from medical and psychology and made a referral, but no one was aware that all of steps had not been followed. You feel that since you did not write the prescriptions or maladminister them that the harm is done and the systemic defect is unmanageable unless placed in the hands of a higher jurisdiction. The relief you seek is reinstating the treatment appropriate for your age group, a transfer to Phoenix to pursue a college course offered by Villanova and 17 million dollars.

I find that the Grievance Officer properly investigated your grievance concerns and provided an appropriate response. As previously stated by the grievance officer, you were appropriately discontinued from treatment. Although you cite claims that you were harmed and that the medications were "maladministered," those claims were not be responded to as you were discontinued from Feminizing Hormone Treatment protocol in August 2020. Your opportunity to address and/or grieve those issues has passed and raising those claims now is untimely. The grievance officer properly addressed your grievance and indicated that policy will be followed prior to initiating Feminizing Hormone Treatment protocol again. You will not be reinstated on Feminizing Hormone Therapy treatment until the final authorization, in accordance with policy, is made.

Therefore, I uphold the initial response and your appeal and any requested relief is denied.

| | |
|---|---|
| Signature: | |
| Name: | L. Harry |
| Title: | Facility Manager |
| Date: | 09/01/21 |



**Facility Manager's Appeal Response**
SCI Camp Hill
2500 Lisburn Rd
Camp Hill, PA, 17001-8837

09/01/2021 08:29

CC: DC-15
    File

To: Chief, Secretary's Office of Inmate Grievances and Appeals
   Department of Corrections
   1920 Technology Parkway
   Mechanicsburg, PA 17050

   <u>This is an appeal to Final Review of Grievance number 936918</u>

   Through due diligence grievant put before Grievant Coordinator Heist,
Initial Review Response officer W. Nicklow, and Superintendent Harry the
ineptitude that was expressed through the systemic defects of the Health Care
Administration [Personnel] as manifest by the blatant maltreatment of grievant
when carrying out the Standards of Care [Protocol] for grievant's Gender
Transition.

   Through the grievance-appeal system ample opportunity was afforded to the
above said arbiters to rectify and thus cease the on-going harm, harm that, if
proper procedure had been followed, would not had happen.

   Grievant will now outline the facts of this case and where it went wrong due
to omissions of proper and standard protocol that is to be followed by the Health
Care Administration [Personnel] when initiating and following through the
procedure(s) for Gender Transition.

   Fact 1: Grievance #936918 was initiated, in part, due to pertinent
information, that was beyond grievant's knowing, brought to grievant's attention
on 6/30/21 by Mr. George Clements [CCPM] in which he stated that (1) "Starting
you early was a mistake,..." Mr. Clements's acknowledgment of an **error** having
occurred is reinforced by Mr. W. Nicklow's Initial Review Response in which he
states, in part, the following: "The available record indicate that the treatment
was initiated prematurely and in violation of Departmental Policy 13.2.1.

   The **"mistake"**, which originates from the **"violation of Departmental Policy
13.2.1.**, is in no way a **"mistake"** committed by grievant, just as grievant is not
blameworthy of the **violation of departmental Policy"**, but it is the Health Care
Administration that is blameworthy of violating their own policy thus creating
mistakes due to their negligence.

   The Standard of Care [Protocol] for Gender Transition (Psychological
counseling, Psychiatric care, and Medical treatments) is a stringent and exacting
series of steps indelibly outlined by the American Psychiatric Association,
American Medical Association, World Professional Association for Transgender
Health, and Mayo Clinic, to name a few, that leaves no guesswork regarding proper
procedure.

Date: 9/10/21                          A50426

(page 1 of 2)

W. Nicklow states in their Initial Review Response that: "The Gender
Dysphoric Review Committee [GDRC], chaired by the Department's Chief
Psychiatrist, must review and approve each Individual Recovery Plan." Utilizing
the DSM-5 (for diagnosis) interconnected steps go into the IRP. The Psychology
Department collaborates with the Psychiatry Department in which an IRP is done.
If hormone therapy is a part of the overall plan a referral to the Site Medical
Director. The CHCA shall compile the evaluations to be sent to the BHCS. This
packet that is to forward by the CHCA to the BHCS shall have an IRP that includes
hormone therapy.

It is not the responsibility of grievant to see to it that proper chain-of-
command is carried out. Throughout this whole process steps were omitted. These
omission led to the interfering with treatment once prescribed. Because of there
being more than one omission throughout the stages of Health Care
Administration's chain-of-command grievant suffered and continue to suffer
unnecessary and wanton infliction of pain due to said negligence.

Grievant's reasserts their Consent Form issue. If the Site Psychiatrist
develops an IRP and a referral is made to medical for Hormone Treatment a Consent
Form shall be signed. The various sub-departments within the Health Care
Administration cannot lay claim to having no knowledge of the on-goings regarding
grievant's treatment. Upon receiving the completed packet, Consent Form included,
the CHCA sends said packet to The BHCS. If the IRP was never received by the
GDRC, via the CHCA, grievant cannot be held accountable for their actions. With
regard to "untimely" issues. When relevant information becomes available
regarding how the harm came about, being that it is "newly discovered", it
becomes relevant in the eyes of the Court. Federal Court only requires the
exhaustion of a grievance -AND- whether harm was done, not the timeliness of the
issues.

Being that grievant has been told, and is now being told once more, that the
entire process will be initiated once again only reinforces and thus allows the
harm forced onto grievant to continue. This Final appeal before you is just that.
Hormone Replacement Therapy [HRT] was initiated. The psychological effects, as
well as physiological, due to abrupt stoppage, were never taken into account by
Health Care staff, nor was grievant counseled regarding those negative side
effects, as outlined in the Consent Form. The "premature" treatment, as mentioned
by W. Nicklow, is comparable to administering the wrong treatment [medication].
Administering said hormones incorrectly is maladministering.

Grievant seeks resolution via reinstatement of Feminizing Hormone Therapy
[FHT] in the proper manner for grievant's age group and compensation for the harm
and wanton affliction of pain. Thank you.

(See remedy as outlined on Initial
Grievance and Appeal to superintendent) (page 2 of 2)

Date: 9/10/21 AS-0426

To: Chief Secretary's Office of Inmate Grievances & Appeals
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050


RE: WILLIAM BASEMORE (AS-0426) Grievance #936918

WEDNESDAY-November-10-2021


Please be advised of the following:

The above named grievant,  on Tuesday, November 9, 2019, at 8:30p.m., received Grievance Referral (Notice to Inmate), dated 11/02/2021 04:18, signed by Chief Grievance Officer D. Varner. The above named document (Grievance Referral) was received three (3) days outside of the thirty (30) working days allowed for an appropriate response.

Grievant makes it known, in their 11/8/21 correspondence) that they afforded five (5) working days for said Appeal and attachments to reach your office, which is in relative close proximity to SCI-Camp Hill. This correspondence is so as to inform you that grievant did not receive your Grievance Referral document within the thirty days, in accordance with DC-ADM 804 Inmate Grievance System Procedures Manual Section 2- Appeals, Attachment 2-1, as typed at the bottom of your Grievance Referral document, and as outlined in the above named DC-ADM document.

---

**\*Please Note:** Grievant met with PRT (Psychiatrist Dr. Mushtag, Psychologist Stein, Psychologist Grimes, Unit Manager Digby, Counselors Arnold and Fagnani) on 9/23/21. Dr Mushtag did not reverse the assessment and diagnosis of grievant's Gender Dysphoria, an assessment performed by Dr Ademolla Bello but concurred with their assessment and diagnosis. Grievant's Individual Recovery Plan [IRP] upon completion shall be forwarded to CHCA Beth Herb and then forward to BHCS and eventually reaching the Gender Dysphoric Review Committee [GDRC].

The above said steps were initiated and taken five (5) weeks prior to this correspondence being forwarded to your office. If the GDRC does not unanimously agree to approve grievant's IRP it **shall** become the responsibility of the Department Chief Psychiatrist. After review the IRP shall be returned to the CHCA as either approved, or with recommendations.

c: Chief Secretary's Office of Inmate Grievances & Appeals; File.

"Respectfully submitted,
William Ba———

To: Chief Secretary's Office of Inmate Grievance and Appeals
Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

RE: WILLIAM BASEMORE (AS-0426) GRIEVANCE #936918

Please be advised of the following: Above named grievant submitted **Final Appeal** of grievance number 936918 on 9/10/21 (said final appeal, along with initial grievance and subsequent responses and appeals via U.S. Postal Service having attached cash slip, which was signed by block officer and placed in the housing unit's mailbox).

An appeal to final review, according to DC-ADM 804, Section 2- Appeals, 2. Staff Responsibility a(1), shall be responded to within 30 days of receipt unless otherwise extended' and/or referred. Please be advised that grievant, out of courtesy allowed 5 working days for said appeal to reach your office. Said lack of response is default.

Grievant submits this correspondence so as to inform you that they, as of the 11/5/21, have not received any response from your office. Please respond to this correspondence accordingly.

William Ba———
11/5/21

cc: SOIGA, File

To: Chief Secretary's Office of Inmates Grievances and Appeals
    Department of Corrections
    1920 Technology Parkway
    Mechanicsburg, PA 17050


RE: WILLIAM BASEMORE (AS-0426) GRIEVANCE #936918


        Please be advised of the following:

        Above named grievant submitted **Final Appeal** of the above numbered grievance
on 9/10/21 (along with Initial Grievance, Initial Review Response, appeal to
Superintendent Harry, and Facility Manager's Appeal Response), by placing the
complete "packet" in an envelope, along with cash slip into the hands of block
officer for signing of said cash slip, and thus placing said packet in the locked
block mail box, thus completing two-thirds of the Exhaustion process.

        An appeal to Final Review, according to DC-ADM 804, Section 2- Appeals, 2.
Staff Responsibility a(1), **Shall** be responded to within 30 days of receipt unless
otherwise extended and/or referred. Please be advised that grievant, out of
courtesy, afforded five (5) days for said appeal packet to reach your office (a
fair amount of time due to proximity).

        Grievant submits this correspondence so as to inform you that they, as of
11/8/21, have not received any correspondence from your office, in accordance
with policy.

chief
CC: Secreday's Office of Inmates
    Grievances and Appeals, File

"Respectfully Submitted
William Bas_____
Date: 11/8/21

To: Secretary's Office of Inmate Grievances & Appeals
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

Friday-January-28-2022

RE: WILLIAM BASEMORE (AS-0426) GRIEVANCE #936918

Please be advised of the following:

Grievant [WILLIAM BASEMORE], submits this correspondence to you in your "official capacity" as the above entity that gives a **Final Review** of a grievance that has gone through the grievance stages (Initial Grievance, Initial Review and, appeal to the Facility Manager). Grievant has exhausted all the necessary procedural steps required of them.

Your 11/02/2021 04:18 **Grievance Referral (Notice to Inmate)** correspondence stated that "this office has reviewed the documents" and, "Upon completion of this review it is the determination of this Office to solicit input from an appropriate Central Office Bureau relative to the issue(s) raised in your grievance."

Although it has been twelve weeks since your Grievance Referral correspondence, grievant would like to know any and all newly acquired information as it pertain to grievant number 936918. Although grievant seeks this information. Please be advised of the following: Grievance number 936918, for all intent and purpose, has been exhausted by grievant. Thank you.

"Respectfully submitted,

S/ *William Basemore*

William Basemore (AS-0426)
1/28/22

cc: SOIGA,
    file.

To: Chief Secretary's Office of Inmate Grievances & Appeals
Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

RE: WILLIAM BASEMORE (AS-0426) GRIEVANCE #936918

NOTICE

Please be advised of the following:

Grievant, [WILLIAM BASEMORE], on 11/5/21, 11/8/21, and 11/10/21 forwarded correspondences to the above said office regarding the failure to respond within the time limits established in the grievance system's rules (White v. McGinnis, 131 F.3d 593 (6th Cir. 1997)). When a Final Appeal Response is not received by [a] grievant at the time allotted for a response, grievant has exhausted said grievance (Powe v. Ennis, 177 F.3d 393 (5th Cir. 1999).

Although grievant came into receipt of your "11/02/2021 04:18" Grievance Referral correspondence. Said date, as stamped on grievance referral falls outside the 30 working day time frame (DC-ADM 804, Inmate Grievance System Procedure Manual, Section 2- Appeals, page 2-7, 2. Staff Responsibilities a. The SOIGA will ensure that: (1) an appeal to final review is responded to within 30 working days of receipt unless otherwise extended and/or referred). Grievant asserts that said Grievance Referral was received by them, albeit the typo on correspondence 11/10/21 show otherwise, on November 9, 2021.

In accordance with the rules of the Prison Litigation Reform Act (PLRA) Exhaustion Of Administrative Remedies (42 U.S.C. § 1997e (a)), all of the above explanatory notes by grievant, reflects a show of due diligence on grievant's part. Thank you.

"Respectfully submitted,

S/ _William Bas_

William Basemore (AS-0426)
Date: 1/31/22

cc: SOIGA,
    file.

ProcessedIn transitDelivered

| DATE | TIME | LOCATION | STATUS |
|------|------|----------|--------|
| Mar 1 | 10:15 AM | Mechanicsburg, PA, United States | Delivered, front desk/reception/mail room |
| Mar 1 | 6:10 AM | Mechanicsburg, PA, United States | Out for delivery |
| Mar 1 | 3:04 AM | Mechanicsburg, PA, United States | Arrived at post office |
| Feb 28 | 12:00 AM | | In transit to next facility |
| Feb 24 | 1:35 PM | Harrisburg Pa Distribution Center | Departed USPS regional facility |







**Grievance Referral**
**(Notice to Inmate)**

Secretary's Office of Inmate Grievances & Appeals
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

11/02/2021 04:18

| Inmate Name: | BASEMORE, WILLIAM | DOC #: | AS0426 |
|---|---|---|---|
| SCI Filed: | Camp Hill | Current SCI: | Camp Hill |
| Grievance #: | 936918 | | |

This serves to acknowledge receipt of your appeal to final review for the grievance noted above. In accordance with the provisions of DC-ADM 804, "Inmate Grievance System Policy", this Office has reviewed the documents submitted; including your initial grievance, the grievance officer's response, your appeal to the facility manager, the facility manager's response, and the issues you raised to final review. Upon completion of this review, it is the determination of this Office to solicit input from an appropriate Central Office Bureau relative to the issue(s) raised in your grievance. Therefore, please be advised that the final review decision will be delayed pending review by the office to which it has been referred. Upon completion of this review, however, a determination will be made and you will be provided with a final appeal decision in writing.

**Action: Referral**

**Bureau/Office:**

- Health Care - Referral Date : 11/02/2021

| Signature: | *Lori Marie for* |
|---|---|
| Name: | D. Varner |
| Title: | Chief Grievance Officer |
| Date: | 11/02/21 |

cc:  DC-15/Superintendent – Camp Hill
Grievance Office

---

**DC-ADM 804, Inmate Grievance System Procedures Manual**

**Section 2 - Appeals, Attachment 2-I**                    Issued: 1/26/2016  Effective: 2/16/2016

AS0426      Grievance #:936918

BASEMORE, WILLIAM                                        Page1 of 1

2022

# Secretary's Office of Inmate Grievances & Appeals
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

This serves to acknowledge receipt of information associated with your intent to appeal a grievance (identified below, if available) to final review, to communicate your concern(s) to the Secretary's Office of Grievances and Appeals, and/or to check the status of review related to your matter.

| Inmate Name: | William Basemore | Inmate Number: | AS0426 |
|---|---|---|---|
| SCI Filed at: | Camp Hill | Current SCI: | Camp Hill |
| Grievance # (if available): | 936918 | | |

| | | |
|---|---|---|
| | | a) You have already received final disposition/review on this issue through this Office. |
| | | b) This Office has no prior record of receipt of an appeal from you regarding this issue. |
| | | c) You have already filed a grievance to seek review and resolution of this matter. |
| | | d) You are encouraged to work through institutional channels to resolve your complaint initially.  If unable to resolve your complaint informally, be advised that DC-ADM 804 provides a mechanism for all inmates to seek formal resolution for concerns. |
| | | e) You failed to provide the official grievance number for identification purposes. |
| | | f) Your claim to have grieved and/or appealed this concern at the institutional level without response does not entitle you to direct appeal to final review.  Rather, contact the Grievance Coordinator or Facility Manager's office regarding the status of your appeal. |
| | | g) You have not yet appealed this issue to the Facility Manager.  Final review will not be granted until you do so.  Upon receiving a response from the Facility Manager at the respective facility, you may once again submit a timely written appeal to this Office for final review.  Be sure that your appeal to this office includes **all** the necessary documents as outlined in DC ADM 804.  If **all** documents are not received with your appeal, it may be dismissed.  This response does not grant you a right to an appeal if it would otherwise have been untimely to pursue that appeal to the Superintendent. |
| | x | h) Your grievance and/or correspondence is being filed without further action for the reason(s) specified in the Comments/Action Taken section below. |
| | | i) The following action has been taken in response to the inquiry, request, or concern communicated in your letter. |

| Comments/Action Taken: |
|---|
| As you are aware, the above listed grievance number was referred to the Bureau of Healthcare Services on 11/02/21. Review of our inmate grievance tracking system finds that a response from them is still pending. We cannot complete a proper final review response until we receive the bureau's findings. I have emailed someone from the bureau in the hopes of expediting their response. Once we complete our final review response, it will be sent to you. Your continued patience is appreciated. |

| Signature: | Keri Moore   KM | Title: | Assistant Chief Grievance Officer |
|---|---|---|---|
| Date: | 02/22/22 | | |

KLM/TAK

cc:   DC-15/Superintendent - CAM
      Grievance Office



**Final Appeal Decision**

Secretary's Office of Inmate Grievances & Appeals
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

03/10/2022 07:32

| | | | |
|---|---|---|---|
| **Inmate Name:** | BASEMORE, WILLIAM | **DOC #:** | AS0426 |
| **SCI Filed:** | Camp Hill | **Current SCI:** | Camp Hill |
| **Grievance #:** | 936918 | | |

This serves to acknowledge receipt of your appeal to the Secretary's Office of Inmate Grievances and Appeals for the grievance noted above. In accordance with the provisions of DC-ADM 804, Inmate Grievance System Policy, the following response is being provided based on a review of the entire record of this grievance. The review included your initial grievance, the Grievance Officer's response, your appeal to the Facility Manager, the Facility Manager's response, the issues you raised in final review, and (when applicable) any revised institutional responses required as a result of a subsequent remand action by this office. As necessary, input from appropriate Central Office Bureaus (e.g., Health Care Services, Chief Counsel, Office of Special Investigations and Intelligence, etc) may have been solicited in making a determination in response to your issue as well.

**Decision:Uphold Response**

It is the decision of the Secretary's Office of Inmate Grievances and Appeals to uphold the initial response, uphold the inmate, or Uphold in part/Deny in part. This response will include a brief rationale, summarizing the conclusion, any action taken to resolve the issue(s) raised in the grievance and your appeal and relief sought.

**Response:**

Your concern of not being provided proper medical care was reviewed by the staff at the Bureau of Health Care Services.

They reviewed the medical record and determined the medical care provided was reasonable and appropriate. The findings of the review concur with the initial review response. These clinical decisions are made by your attending practitioner. You are encouraged to participate in your treatment plan and to discuss your concerns or changes of condition with a practitioner.

No evidence of wrongdoing was identified. Therefore, your appeal and requested relief are denied.

| | |
|---|---|
| **Signature:** | *Keri Moore for* |
| **Name:** | D. Varner |
| **Title:** | Chief Grievance Officer |
| **Date:** | 03/10/22 |

CC: DC-15/Superintendent - Camp Hill
Grievance Office

EXHIBIT: A (Consent Form #1)

BASEMORE, WILLIAM   #AS0426                          DOB: 1/31/1964 (56y)   **Location:** N-B2-2037-01

## Informed Consent for Feminizing Hormone Therapy

**Current Facility:**

  SCI CAMP HILL

This informed consent form refers to the use of estrogen and/or androgen antagonists (sometimes called "anti-androgens" or "testosterone blockers") by persons who have been diagnosed with Gender Dysphoria and their Individual Treatment Plan with feminization.  The use of estrogen and/or androgen antagonists is also called feminizing hormone therapy.  While there are risks associated with taking feminizing hormone therapy, when appropriately prescribed, it can greatly improve mental health and quality of life.

You are asked to sign this form to show that you understand the changes that will occur with feminizing hormone therapy, as well as the benefits and risks.  If you have any questions or concerns about the information below, please talk with your healthcare provider so you can make an informed decision about your treatment.

## Effects of Feminizing Hormone Therapy

1. I have been informed that feminizing hormone therapy is used to reduce the male features and increase the feminine features of my body.  The effects may take several months or longer to become noticeable.

2. The changes seen in my body may not be the same as other persons on feminizing hormone therapy, and the rate and degree of change cannot be predicted.

3. I understand that as soon as I start taking feminizing hormone therapy, I will begin to develop breasts.  If hormone therapy is stopped, the breast tissue will remain, but may decrease slightly.  Once I develop breasts, I should follow the recommended screenings for breast cancer as advised by my healthcare provider.

4. I understand that the following changes will likely occur while taking feminizing hormone therapy, but will likely reverse if the feminizing hormone therapy is stopped:

- Skin becomes softer.
- Decrease in muscle mass and upper body strength.
- Body hair growth becomes less noticeable and grows more slowly (but it will likely not stop completely even after years on feminizing hormone therapy).
- Male pattern baldness slows down (but will probably not stop completely, and hair that has already been lost will likely not grow back).
- Fat redistributes to a more feminine pattern.

5. I understand that taking feminizing hormone therapy will make my testicles produce less testosterone, which can affect my overall sexual and reproductive function:

- Sperm may not mature, leading to reduced fertility.  The ability to make sperm normally may or may not come back even after stopping feminizing hormone therapy.
- Even with decreased sperm productions, I may still be able to make someone pregnant, and I am aware of birth control options.
- My testicles may shrink by 25-50%.  Regular testicular examinations are still recommended.
- The amount of fluid ejaculated may be reduced.
- There is typically a decrease in morning and spontaneous erections.
- Erections may not be firm enough for penetrative sex.
- Libido (sex drive) may decrease.

6. I understand that feminizing hormone therapy will not likely cause facial hair to go away (although it may be thinner), or my Adam's apple to shrink, or the pitch of my voice to heighten.

## Risks of Feminizing Hormone Therapy

---

**DC-572 Informed Consent for Feminizing Hormone Therapy**
DC-572 Informed Consent for Feminizing Hormone Therapy

**Patient Name:** BASEMORE, WILLIAM
**Patient Number:** AS0426
**Location:** N-B2-2037-01
**DOB:** 1/31/1964
**Facility:** SCI CAMP HILL
**Electronically Signed By** VOORSTAD, THEODOOR, MD **on** 07/24/2020 14:02:42

**BASEMORE, WILLIAM**  #AS0426                    **DOB:** 1/31/1964 (56y)   **Location:** N-B2-2037-01

1. I have been informed of the known possible risks of feminizing hormone therapy which include but are not limited to the following:

- Blood clots in my legs, lungs or brain.
- Elevated blood pressure, heart problems (such as heart attack) and high cholesterol.
- Elevated prolactin levels (which may indicate a tumor on the pituitary gland).
- Diabetes.
- Nausea/vomiting.
- Migraine headaches.
- Gallbladder disease.
- Liver inflammation.
- Depression.
- Possible increased risk of breast cancer.
- Osteoporosis (weakening of the bones).
- Changes in electrolytes in my blood (specifically, the anti-androgen spironolactone can cause an increase in potassium which can cause life threatening heart problems).
- Death (rare) due to the above-named conditions or other unknown effects.

2. I understand that if I experience any symptoms or have concerns about these risks while taking feminizing hormone therapy, I should be evaluated by my healthcare provider.

3. I understand that some androgen antagonists make it more difficult to evaluate the results of PSA (prostate-specific antigen) test, which can make it more difficult to monitor prostate problems.

4. I agree to follow the recommended dosage of feminizing hormone therapy as prescribed for me by my healthcare provider. I understand that taking more than is prescribed or taking additional hormones obtained elsewhere may compromise my health and lead to more serious side effects. Too much estrogen in my system may actually slow the results.

5. I have been informed that tobacco use can adversely affect my health and has been associated with an increased risk for blood clots, stroke, heart attacks, and high blood pressure especially when combined with estrogen. I understand that if I smoke, I should quit smoking before taking estrogen. I have been given information about how to get help to quit smoking.

6. I have been informed that taking any recreational drugs, dietary supplements, herbal supplements, and/or hormones other than those prescribed for me, or any other prescriptions may interact with my prescribed feminizing hormone therapy. I am aware that some of these interactions may cause adverse outcomes or even death. I agree to discuss with my healthcare provider any medications purchased from commissary.

7. I understand that my healthcare provider may discontinue my feminizing hormone therapy for medical reasons and/or safety concerns. I understand that stopping feminizing hormone therapy may not reverse the changes that may have already taken place in my body.

8. I understand that feminizing hormone therapy will result in changes that will likely be noticeable by other people, and that some transgender people in similar circumstances have experienced harassment, discrimination, and violence. Others may have lost support of loved ones. I have been advised that referrals can be made for support and/or counseling if I feel this would be helpful at any point now or in the future.

## Monitoring of Feminizing Hormone Therapy

1. I understand that my healthcare provider will need to monitor blood work and do routine physical exams as a part of my feminizing hormone therapy. I have been informed about the recommended frequency of these visits, and I understand that if my healthcare provider does not feel it is safe for me to continue feminizing hormone therapy, it may be withheld until regular checkups and blood work can be done.

2. I understand that I may need to continue feminizing hormone therapy for the rest of my life in order to maintain the desired effects.

3. I have been informed that I can choose to withdraw my informed consent and discontinue feminizing hormone therapy at any time, but it is advised that I do this with the advice of my healthcare provider to make sure there are no negative effects to stopping.

4. I understand that feminizing hormone therapy for transitioning genders has not been researched in large clinical trials and the use of hormones is not approved by the FDA for transitioning genders. This means most of the therapies recommended for gender transition are based on the experience of those in the medical field, not on evidence from research studies. Long term consequences of lifelong feminizing hormone therapy for gender transition are

---

**DC-572 Informed Consent for Feminizing Hormone Therapy**
DC-572 Informed Consent for Feminizing Hormone Therapy

**Patient Name:** BASEMORE, WILLIAM
**Patient Number:** AS0426
**Location:** N-B2-2037-01
**DOB:** 1/31/1964
**Facility:** SCI CAMP HILL
**Electronically Signed By** VOORSTAD, THEODOOR, MD on 07/24/2020 14:02:42

largely unknown.

I believe I have adequate knowledge on which to base an informed consent to taking feminizing hormone therapy.  Other options have been explained to me, and I have had sufficient opportunity to discuss all of my questions with my healthcare provider and HRT advocate.

My signature below constitutes my acknowledgement and understanding of this informed consent form.  I have completed the steps necessary as outlines in the HBHC Hormone Protocol.  I authorize and give my informed consent to the provision of feminizing hormone therapy.

Informed Consent for Feminizing Hormone Therapy

Commonwealth of Pennsylvania

Department of Corrections

DC-572

Verson:  6/2015

### 13.2.1, Access to Health Care Procedures Manual

### Attachment 19-A

### Section 19 – Diagnosis and Treatment of Gender Dysphoria

Signatures

BASEMORE, WILLIAM
Captured On: 07/24/20 14:02:42

Theodoor Voorstad, M.D.
Captured On: 07/24/20 14:02:42

### Save Log

| User Name | AuditDateAndTime |
| --- | --- |
| VOORSTAD, THEODOOR, MD | 07/24/2020 14:02:42 |

---

**DC-572 Informed Consent for Feminizing Hormone Therapy**
DC-572 Informed Consent for Feminizing Hormone Therapy

Patient Name: BASEMORE, WILLIAM
Patient Number: AS0426
Location: N-B2-2037-01
DOB: 1/31/1964
Facility: SCI CAMP HILL
Electronically Signed By VOORSTAD, THEODOOR, MD on 07/24/2020 14:02:42

EXHIBIT: B1, B2 (handwritten note from psychologist Grimes,
        Request To Staff from CCPM/PREA Manager Kendall)

SPIROLACTONE 100 mg

ESTRADIOL                1 mg


STARTED: 7.24.2020
STOPPED: 8.12.2020

| Form DC-135A<br><br>**INMATE'S REQUEST TO STAFF MEMBER** | Commonwealth of Pennsylvania<br>Department of Corrections<br><br>INSTRUCTIONS<br>Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently. |
|---|---|

| 1.  To: (Name and Title of Officer)<br>Ms. Como/Ms. Kendall- PREA | 2.  Date:  5/20/20 <br>~~XXXXXX~~ |
|---|---|

| 3.  By: (Print Inmate Name and Number)<br>William Basemore AS-0426<br><br>*Wm Ba̱*<br>Inmate Signature | 4.  Counselor's Name:<br>Counselor Arnold |
|---|---|
| | 5.  Unit Manager's Name:<br>U.M. Digby |
| 6.  Work Assignment:<br>Blockworker | 7.  Housing Assignment:<br>N(B2-37) |

8.  Subject: State your request completely but briefly. Give details.

Please be advised of the following: On 5/4/20 I submitted a Sick-call Request seeking to resume HRT. Medical staff came to see me and said that I would be scheduled with Dr. Voorstad (sick-call was submitted on 5/4/20). My experience with HRT (tablet as well as two 1cc injections prior to my incarceration) was not "experimentation." Circumstances beyond my control, albeit being very personal, were determining factors regarding my current HRT-free state. Although I retain very minor tell-tale signs of a metamorphosis I wish to resume for piece of mind. Thus, if not an inconvenience, I'd very much would like to speak (sit down and talk briefly) with you so that I can relate a couple of issues of personal importance. Again, when convenient I ask, respectfully, that you honor my Request. Thank you.

"Respectfully submitted,

cc: Ms. Como, Ms. Kendall        S/ *Wm Ba̱*

Original: File

9. Response: (This Section for Staff Response Only)

We have notified medical of your request on this date, 5/27/20. You will be seen by medical & psychiatry and then a determination is made for HRT. By this request your request has now been initiated. Please let me know if you are not seen.

| To DC-14 CAR only ☐ | To DC-14 CAR and DC-15 IRS ☐ |
|---|---|

STAFF MEMBER NAME _____ DATE _____

Print: Kendall (N)          Signature: 5/27/20

EXHIBIT: C (8/14/20 Request To Staff to PREA Manager Kendall)

| Form DC-135A | Commonwealth of Pennsylvania |
|---|---|
| **INMATE'S REQUEST TO STAFF MEMBER** | Department of Corrections |
| | **INSTRUCTIONS** |
| | Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently. |

| 1. To: (Name and Title of Officer) <br> (Ms.) Kendall/PREA | 2. Date: <br> 8/14/20 |
|---|---|
| 3. By: (Print Inmate Name and Number) <br> William Basemore AS-0426 <br> *William Bas* <br> Inmate Signature | 4. Counselor's Name: <br> Counselor Arnold |
| | 5. Unit Manager's Name: <br> U.M. Digby |
| 6. Work Assignment: <br> Blockworker | 7. Housing Assignment: <br> N(B2-37) |

8. Subject: State your request completely but briefly. Give details.

Attention: (Ms.) Kendall; This is a follow-up to my 8/12/20 Request. It is my understanding that someone in the Psychology-Medical Dept. supposedly made a mistake in giving me Feminizing Hormone Treatment [FHT] prematurely. However, it is my recollection that it may be six month or "they" may start me right away (which was the case). Being that the FHT is not of the likes of a Motrin or Tylenol, but a neurophysiological altering medication of which I've been taking for 19 days, thus I should not be made to pay the price for professionals not be mindful of protocol. Thus I'm asking of you the following two (2) things: That I be given the name of the Psychiatrist with whom I met with regarding my gender dysphoria and, if at all possible, I ask that you advocate for me to have my treatment restarted or have one or two injections at the conclusion of the six months so as to make up for where I would have been (neurophysiologically/spiritually/emotionally). I ask that you respond to this Request correspondingly. Thank you. *Wm [Milke] Bas*

cc: (Ms.) Kendall; Original: file

9. Response: (This Section for Staff Response Only)

As the PREA Compliance manager, our office only makes a referral for treatment after you express interest. I do not have a role in the medical or mental health decisions surrounding your care.

| To DC-14 CAR only ☐ | To DC-14 CAR and DC-15 IRS ☐ |
|---|---|

STAFF MEMBER NAME ___*Kendall*___       ___*(signature)*___ DATE 8/18/20
Print                                                    Signature

EXHIBIT: D (8/14/20 Request To Staff to PREA Manager Kendall)

| Form DC-135A<br><br>**INMATE'S REQUEST TO STAFF MEMBER** | Commonwealth of Pennsylvania<br>Department of Corrections<br><br>INSTRUCTIONS<br>Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently. |
|---|---|

| 1. To: (Name and Title of Officer)<br>(Ms.) Kendall/PREA | 2. Date:<br>12/14/20 |
|---|---|

| 3. By: (Print Inmate Name and Number)<br>William Basemore AS-0426<br><br>_Wm. Ba_____<br>Inmate Signature | 4. Counselor's Name:<br>Counselor Arnold |
|---|---|
| | 5. Unit Manager's Name:<br>U.M. Digby |

| 6. Work Assignment:<br>Blockworker | 7. Housing Assignment:<br>N/B2-55 |
|---|---|

8. Subject: State your request completely but briefly. Give details.

Attention (Ms.) Kendall: Psychologist Howdyshell informed me that Psychologist Grimes has a personal [Beard] issue and is working on an alternative mask that will not compromise his beard. My last meeting with Dr. Voorstad touched on something that I'm in need of discussing with Psychologist Grimes, and it concerns Orchectome (at least a "half" Orchectome) My testosterone, as of last blood test, is that of a male. My stamina/endurance routine no doubt contributes to it. I'd consider (actually I've considered it) the removal of one testes prior to hormone therapy or during hormone therapy for that matter, so as to reduce the war of attrition between the hormones I will take (to get me where I need to be) as oppose to my being anchored by high testosterone levels. This, as well as other matters, are things I need to discuss with the psychologist I've already established a rapport with. Thank you for your time.

cc: (Ms.) Kendall
Original File

"Respectfully submitted,
_Wm. Ba_____

9. Response: (This Section for Staff Response Only)

| To DC-14 CAR only ☐ | To DC-14 CAR and DC-15 IRS ☐ |
|---|---|

STAFF MEMBER NAME _____   _____   DATE _____
                          Print                    Signature

**7.2.1, Counseling Services Procedures Manual - Section 3, Request Slips**          **Attachment 3-A**

EXHIBIT: E (12/22/20 Request To Staff to Psychologist Howdyshell)

| Form DC-135A<br><br>**INMATE'S REQUEST TO STAFF MEMBER** | Commonwealth of Pennsylvania<br>Department of Corrections<br><br>INSTRUCTIONS<br>Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently. |
|---|---|
| 1.  To: (Name and Title of Officer)<br>Psychologist Howdyshell | 2.  Date:<br>  12/22/20 |
| 3.  By: (Print Inmate Name and Number)<br>William Basemore AS-0426<br><br>_Wm Bas_<br>Inmate Signature | 4.  Counselor's Name:<br>  Counselor Arnold |
|  | 5.  Unit Manager's Name:<br>  U.M. Digby |
| 6.  Work Assignment:<br>  Blockworker | 7.  Housing Assignment:<br>  N(B2-55) |

8.  Subject: State your request completely but briefly. Give details.

   Please find enclosed (attached) with this Request my 12/14/20 Request to

(Ms.) Kendall. The enclosed information is something that I would've like to ran

by Psychologist Grimes. I'm coming up on six (6) months of having made it known

to staff [Psychologist Grimes, Dr. Voorstad, Psychiatrist Bello, (Ms.) Kendall/

Cuomo, and yourself regarding my identification of self]. My disposition has not

changed. Thus I'd like to resume the hormone therapy that was initiated by Dr.

Voorstad, during the month of July in which I took hormones for close to 30 days,

so as to get to where I need to be. Thank you.    "Respectfully submitted,

cc: (Ms. Howdyshell) Original: File                _Wm Bas_

9.  Response: (This Section for Staff Response Only)

| To DC-14 CAR only ☐ | To DC-14 CAR and DC-15 IRS ☐ |
|---|---|

STAFF MEMBER NAME _____  _____ DATE _____
                            Print                         Signature

EXHIBIT: F (10/22/21 Request To Staff to CHCA Beth Herb)

| Form DC-135A<br><br>**INMATE'S REQUEST TO STAFF MEMBER** | Commonwealth of Pennsylvania<br>Department of Corrections<br><br>INSTRUCTIONS<br>Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently. |
|---|---|

| 1. To: (Name and Title of Officer)<br>*Beth Herb/ CHCA* | 2. Date:<br>*10/22/21* |
|---|---|

| 3. By: (Print Inmate Name and Number)<br>*William Basemore, AS-0426*<br><br>*William Base*<br>Inmate Signature | 4. Counselor's Name:<br>*Counselor Arnold*<br><br>5. Unit Manager's Name:<br>*U. M. Digby* |
|---|---|

| 6. Work Assignment:<br>*Blockworker* | 7. Housing Assignment:<br>*N (B2-55)* |
|---|---|

8. Subject: State your request completely but briefly. Give details.

*I met with DR [Psychiatrist] Mwhtag, Psychologist Stein, and my assigned psychologist [Grimes] on 9/23/21 for PRT.*
*It is my understanding, from the communication conveyed to me, by my assigned psychologist [Grimes] that the necessary steps were taken to "re-start" my Hormone Replacement Therapy, that was abruptly stopped on 8/12/20.*
*It has been fourteen months and one week (as of the above date) since the stoppage.*
*I was scheduled to meet with medical on 10/4 and 10/5/21. Both meetings were cancelled.*
*Being that my IRP must come to you via the psychiatry/psychology Dept and forward to the BHCS and eventually forward to the QDRC. My question is as follows: Where along this continuum does the problem now sit?   Thank you   W/B Base*
*CC: Beth Herb; File.*

9. Response: (This Section for Staff Response Only)

| To DC-14 CAR only ☐ | To DC-14 CAR and DC-15 IRS ☐ |
|---|---|

STAFF MEMBER NAME _____   _____ DATE _____
   Print                                    Signature

EXHIBIT: G (10/22/21 Request To Staff to Psychiatrist Mushgaq)

| Form DC-135A<br><br>**INMATE'S REQUEST TO STAFF MEMBER** | Commonwealth of Pennsylvania<br>Department of Corrections<br><br>INSTRUCTIONS<br>Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently. |
|---|---|
| 1. To: (Name and Title of Officer)<br>*Psychiatrist Dr. Mushdae* | 2. Date:<br>*10/22/21* |
| 3. By: (Print Inmate Name and Number)<br>*William Basemore AS-0426*<br>*William Bas*<br>Inmate Signature | 4. Counselor's Name:<br>*Counselor Arnold* |
|  | 5. Unit Manager's Name:<br>*U.M. Digby* |
| 6. Work Assignment:<br>*Blockworker* | 7. Housing Assignment:<br>*N (B2-55)* |

8. Subject: State your request completely but briefly. Give details.

*(If I mispelled your name please accept my apology)*

*This Request is due, in part, to my having gone an additional four (4) weeks (since we met), and still my Hormone Replacement Therapy (HRT) has not resumed. It has been fourteen months and one week (as of the above date) since the abrupt stoppage of said hormone treatment. I meet with my assigned Psychologist infrequently and, I was, as of our last meeting, informed that you took the necessary steps to "re-start" my hormone treatment. I was scheduled to meet with medical on both 10/4, and 10/5/21. Both meetings were cancelled. I am being kept in the dark regarding the future of my treatment. Who do I need to write to to get answers? Thank you.   W.B.*
*cc: Dr. Mushdae; file.*

9. Response: (This Section for Staff Response Only)

| To DC-14 CAR only ☐ | To DC-14 CAR and DC-15 IRS ☐ |
|---|---|

STAFF MEMBER NAME _____   _____ DATE _____
Print                                Signature

EXHIBIT: (Consent Form #2)

## Informed Consent for Feminizing Hormone Therapy

**Current Facility:**

SCI CAMP HILL

This informed consent form refers to the use of estrogen and/or androgen antagonists (sometimes called "anti-androgens" or "testosterone blockers") by persons who have been diagnosed with Gender Dysphoria and their Individual Treatment Plan with feminization. The use of estrogen and/or androgen antagonists is also called feminizing hormone therapy. While there are risks associated with taking feminizing hormone therapy, when appropriately prescribed, it can greatly improve mental health and quality of life.

You are asked to sign this form to show that you understand the changes that will occur with feminizing hormone therapy, as well as the benefits and risks. If you have any questions or concerns about the information below, please talk with your healthcare provider so you can make an informed decision about your treatment.

## Effects of Feminizing Hormone Therapy

1. I have been informed that feminizing hormone therapy is used to reduce the male features and increase the feminine features of my body. The effects may take several months or longer to become noticeable.

2. The changes seen in my body may not be the same as other persons on feminizing hormone therapy, and the rate and degree of change cannot be predicted.

3. I understand that as soon as I start taking feminizing hormone therapy, I will begin to develop breasts. If hormone therapy is stopped, the breast tissue will remain, but may decrease slightly. Once I develop breasts, I should follow the recommended screenings for breast cancer as advised by my healthcare provider.

4. I understand that the following changes will likely occur while taking feminizing hormone therapy, but will likely reverse if the feminizing hormone therapy is stopped:

- Skin becomes softer.
- Decrease in muscle mass and upper body strength.
- Body hair growth becomes less noticeable and grows more slowly (but it will likely not stop completely even after years on feminizing hormone therapy).
- Male pattern baldness slows down (but will probably not stop completely, and hair that has already been lost will likely not grow back).
- Fat redistributes to a more feminine pattern.

5. I understand that taking feminizing hormone therapy will make my testicles produce less testosterone, which can affect my overall sexual and reproductive function:

- Sperm may not mature, leading to reduced fertility. The ability to make sperm normally may or may not come back even after stopping feminizing hormone therapy.
- Even with decreased sperm productions, I may still be able to make someone pregnant, and I am aware of birth control options.
- My testicles may shrink by 25-50%. Regular testicular examinations are still recommended.
- The amount of fluid ejaculated may be reduced.
- There is typically a decrease in morning and spontaneous erections.
- Erections may not be firm enough for penetrative sex.
- Libido (sex drive) may decrease.

6. I understand that feminizing hormone therapy will not likely cause facial hair to go away (although it may be thinner), or my Adam's apple to shrink, or the pitch of my voice to heighten.

## Risks of Feminizing Hormone Therapy

---

**DC-572 Informed Consent for Feminizing Hormone Therapy**

DC-572 Informed Consent for Feminizing Hormone Therapy

**Patient Name:** BASEMORE, WILLIAM
**Patient Number:** AS0426
**Location:** N-B1-1032-01
**DOB:** 1/31/1964
**Facility:** SCI CAMP HILL
**Electronically Signed By** VOORSTAD, THEODOOR, MD on 02/01/2022 16:00:19

1. I have been informed of the known possible risks of feminizing hormone therapy which include but are not limited to the following:

- Blood clots in my legs, lungs or brain.
- Elevated blood pressure, heart problems (such as heart attack) and high cholesterol.
- Elevated prolactin levels (which may indicate a tumor on the pituitary gland).
- Diabetes.
- Nausea/vomiting.
- Migraine headaches.
- Gallbladder disease.
- Liver inflammation.
- Depression.
- Possible increased risk of breast cancer.
- Osteoporosis (weakening of the bones).
- Changes in electrolytes in my blood (specifically, the anti-androgen spironolactone can cause an increase in potassium which can cause life threatening heart problems).
- Death (rare) due to the above-named conditions or other unknown effects.

2. I understand that if I experience any symptoms or have concerns about these risks while taking feminizing hormone therapy, I should be evaluated by my healthcare provider.

3. I understand that some androgen antagonists make it more difficult to evaluate the results of PSA (prostate-specific antigen) test, which can make it more difficult to monitor prostate problems.

4. I agree to follow the recommended dosage of feminizing hormone therapy as prescribed for me by my healthcare provider. I understand that taking more than is prescribed or taking additional hormones obtained elsewhere may compromise my health and lead to more serious side effects. Too much estrogen in my system may actually slow the results.

5. I have been informed that tobacco use can adversely affect my health and has been associated with an increased risk for blood clots, stroke, heart attacks, and high blood pressure especially when combined with estrogen. I understand that if I smoke, I should quit smoking before taking estrogen. I have been given information about how to get help to quit smoking.

6. I have been informed that taking any recreational drugs, dietary supplements, herbal supplements, and/or hormones other than those prescribed for me, or any other prescriptions may interact with my prescribed feminizing hormone therapy. I am aware that some of these interactions may cause adverse outcomes or even death. I agree to discuss with my healthcare provider any medications purchased from commissary.

7. I understand that my healthcare provider may discontinue my feminizing hormone therapy for medical reasons and/or safety concerns. I understand that stopping feminizing hormone therapy may not reverse the changes that may have already taken place in my body.

8. I understand that feminizing hormone therapy will result in changes that will likely be noticeable by other people, and that some transgender people in similar circumstances have experienced harassment, discrimination, and violence. Others may have lost support of loved ones. I have been advised that referrals can be made for support and/or counseling if I feel this would be helpful at any point now or in the future.

## Monitoring of Feminizing Hormone Therapy

1. I understand that my healthcare provider will need to monitor blood work and do routine physical exams as a part of my feminizing hormone therapy. I have been informed about the recommended frequency of these visits, and I understand that if my healthcare provider does not feel it is safe for me to continue feminizing hormone therapy, it may be withheld until regular checkups and blood work can be done.

2. I understand that I may need to continue feminizing hormone therapy for the rest of my life in order to maintain the desired effects.

3. I have been informed that I can choose to withdraw my informed consent and discontinue feminizing hormone therapy at any time, but it is advised that I do this with the advice of my healthcare provider to make sure there are no negative effects to stopping.

4. I understand that feminizing hormone therapy for transitioning genders has not been researched in large clinical trials and the use of hormones is not approved by the FDA for transitioning genders. This means most of the therapies recommended for gender transition are based on the experience of those in the medical field, not on evidence from research studies. Long term consequences of lifelong feminizing hormone therapy for gender transition are

---

**DC-572 Informed Consent for Feminizing Hormone Therapy**
DC-572 Informed Consent for Feminizing Hormone Therapy

Patient Name: BASEMORE, WILLIAM
Patient Number: AS0426
Location: N-B1-1032-01
DOB: 1/31/1964
Facility: SCI CAMP HILL
Electronically Signed By VOORSTAD, THEODOOR, MD on 02/01/2022 16:00:19

largely unknown.

I believe I have adequate knowledge on which to base an informed consent to taking feminizing hormone therapy. Other options have been explained to me, and I have had sufficient opportunity to discuss all of my questions with my healthcare provider and HRT advocate.

My signature below constitutes my acknowledgement and understanding of this informed consent form. I have completed the steps necessary as outlines in the HBHC Hormone Protocol. I authorize and give my informed consent to the provision of feminizing hormone therapy.

Informed Consent for Feminizing Hormone Therapy

Commonwealth of Pennsylvania

Department of Corrections

DC-572

Verson: 6/2015

## *13.2.1, Access to Health Care Procedures Manual*

## *Attachment 19-A*

## *Section 19 – Diagnosis and Treatment of Gender Dysphoria*

## Signatures

BASEMORE, WILLIAM
Captured On: 02/01/22 16:00:19

Theodoor Voorstad, M.D.
Captured On: 02/01/22 16:00:19

## Save Log

| User Name | AuditDateAndTime |
|---|---|
| VOORSTAD, THEODOOR, MD | 02/01/2022 16:00:19 |

**DC-572 Informed Consent for Feminizing Hormone Therapy**
DC-572 Informed Consent for Feminizing Hormone Therapy

**Patient Name:** BASEMORE, WILLIAM
**Patient Number:** AS0426
**Location:** N-B1-1032-01
**DOB:** 1/31/1964
**Facility:** SCI CAMP HILL
**Electronically Signed By** VOORSTAD, THEODOOR, MD on 02/01/2022 16:00:19

EXHIBIT: DC-135A INMATE'S REQUEST TO STAFF MEMBER dated: 9/7/22)

| Form DC-135A<br><br>**INMATE'S REQUEST TO STAFF MEMBER** | Commonwealth of Pennsylvania<br>Department of Corrections<br><br>INSTRUCTIONS<br>Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently. |
|---|---|

| 1. To: (Name and Title of Officer)<br>*Mr. Grimes / Psychologist* | 2. Date: *9/7/22* |
|---|---|
| 3. By: (Print Inmate Name and Number)<br>*William Basemore AS-0426*<br>*William Base*<br>Inmate Signature | 4. Counselor's Name:<br>*Counselor Arnold*<br>5. Unit Manager's Name:<br>*U.M. Fells* |
| 6. Work Assignment:<br>*Blockworker* | 7. Housing Assignment:<br>*N (B2-55)* |

8. Subject: State your request completely but briefly. Give details.

*In your capacity as a psychologist I submit this Request so as to inquire about the following:*

*Once hormone therapy has begun, would you ever recommend having it discontinued, and if so, how?*

*Thank you*

*"Respectfully submitted*

*Wm B*

9. Response: (This Section for Staff Response Only)

*In my position, I am not permitted to give medical advice. However, as I am aware of current protocols, any termination of hormone therapy should be titrated and stepped down [crossed out] under medical supervision, at no time is it recommended to stop abruptly.*

| To DC-14 CAR only ☐ | To DC-14 CAR and DC-15 IRS ☐ |
|---|---|

STAFF MEMBER NAME *M. Grimes*          *[signature]*          DATE *9.20.22*
                        Print                              Signature

EXHIBIT: RISK OF HORMONE THERAPY

The Standards of Care
7TH VERSION

# Risks of Feminizing Hormone Therapy (MtF)

**Likely Increased Risk:**

## Venous thromboembolic disease

- Estrogen use increases the risk of venous thromboembolic events (VTE), particularly in patients who are over age 40, smokers, highly sedentary, obese, and who have underlying thrombophilic disorders.
- This risk is increased with the additional use of third generation progestins.
- This risk is decreased with use of the transdermal (versus oral) route of estradiol administration, which is recommended for patients at higher risk of VTE.

## Cardiovascular, cerebrovascular disease

- Estrogen use increases the risk of cardiovascular events in patients over age 50 with underlying cardiovascular risk factors. Additional progestin use may increase this risk.

## Lipids

- Oral estrogen use may markedly increase triglycerides in patients, increasing the risk of pancreatitis and cardiovascular events.
- Different routes of administration will have different metabolic effects on levels of HDL cholesterol, LDL cholesterol and lipoprotein(a).
- In general, clinical evidence suggests that MtF patients with pre-existing lipid disorders may benefit from the use of transdermal rather than oral estrogen.

## Liver/gallbladder

- Estrogen and cyproterone acetate use may be associated with transient liver enzyme elevations and, rarely, clinical hepatotoxicity.
- Estrogen use increases the risk of cholelithiasis (gall stones) and subsequent cholecystectomy.

The Standards of Care
VERSION 7

TABLE 2: RISKS ASSOCIATED WITH HORMONE THERAPY. BOLDED ITEMS ARE CLINICALLY SIGNIFICANT

| Risk Level | Feminizing hormones | Masculinizing hormones |
|---|---|---|
| Likely increased risk | Venous thromboembolic disease[a]<br><br>Gallstones<br><br>Elevated liver enzymes<br><br>Weight gain<br><br>Hypertriglyceridemia | Polycythemia<br><br>Weight gain<br><br>Acne<br><br>Androgenic alopecia (balding)<br><br>Sleep apnea |
| Likely increased risk with presence of additional risk factors[a] | Cardiovascular disease | |
| Possible increased risk | Hypertension<br><br>Hyperprolactinemia or prolactinoma | Elevated liver enzymes<br><br>Hyperlipidemia |
| Possible increased risk with presence of additional risk factors[B] | Type 2 diabetes[a] | Destabilization of certain psychiatric disorders[c]<br><br>Cardiovascular disease<br><br>Hypertension<br><br>Type 2 diabetes |
| No increased risk or inconclusive | Breast cancer | Loss of bone density<br><br>Breast cancer<br><br>Cervical cancer<br><br>Ovarian cancer<br><br>Uterine cancer |

[o]  Note: Risk is greater with oral estrogen administration than with transdermal estrogen administration.

[a]  Risk is greater with oral estrogen administration than with transdermal estrogen administration.

[B]  Additional risk factors include age.

[c]  Includes bipolar, schizoaffective, and other disorders that may include manic or psychotic symptoms. This adverse event appears to be associated with higher doses or supraphysiologic blood levels of testosterone.

EXHIBIT: TRAINING

## B. Diagnosis of GD

1. GD is a condition formally recognized and described by the American Psychiatric Association in the current version of the *Diagnostic and Statistical Manual of Mental Disorders,* 5th edition, (DSM-5), APA 2013.

2. The DSM-5 provides diagnostic criteria to consider when evaluating for the presence of this condition.

3. There are two required criteria that must be present for the diagnosis of GD:

   a. the finding of "a marked incongruence between one's experience/expressed gender and assigned gender, of at least six months duration…" (DSM-5, p. 452); and

   b. that "the condition is associated with clinically significant distress or impairment in social, school (for children)/occupational (for adults), or other important areas of functioning" (DSM-5, p. 452). It will be the primary responsibility of the Site Psychiatrist to establish this diagnosis.

## C. Training

1. It shall be the responsibility of the contracted medical vendor to train its practitioners. [C M V]

2. It shall be the responsibility of the contracted mental health vendor to train the mental health staff (psychiatrists, psychiatric certified registered nurse practitioners [PCRNPs], licensed psychologist managers [LPMs], licensed psychologists [LPs], psychological services specialists [PSSs], psychological services associates [PSAs], and social workers) who shall be involved in the diagnosis and treatment of transgender patients. [C M H V]

3. The training shall be specific to the evaluation, treatment, and management of patients with GD, and may involve professional meetings, group seminars, or individual presentations by experts in the field.

4. Refresher training shall be provided on a yearly basis.

5. The training must be pre-approved by the Department Chief Psychiatrist, or the Department Chief of Clinical Services, as appropriate.

6. The respective medical/mental health contracted vendors shall provide an annual training report to the Bureau of Health Care Services (BHCS).

Issued: 5/23/2016
Effective: 5/30/2016

particularly people currently and formerly incarcerated, and transgender service providers when possible.

## Training

29. Training of medical and mental health professionals competent to work with adults and adolescents who identify as transgender rests upon general clinical competence in the assessment, diagnosis, and treatment of medical and mental health concerns unrelated to gender identity. However, further training is necessary to recognize and diagnose medical and mental health conditions in transgender patients and to distinguish these from gender dysphoria, as well as to gain further knowledge about gender-nonconforming identities and expression and the assessment and treatment of gender dysphoria. Additional training and competence in adolescent developmental issues is particularly necessary for work with transgender youths.

30. Health staff should recommend to custody leadership that correctional staff receive training on transgender patients (as with other special populations) to gain awareness, understanding, and sensitivity to critical issues of health, mental health, and safety.

October 18, 2009 — adopted by the National Commission on Correctional Health Care Board of Directors
April 12, 2015 — reaffirmed with revision
November 1, 2020 — reaffirmed with revision

## Resources

American Academy of Pediatrics. (2018). Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents (Policy Statement). https://pediatrics.aappublications.org/content/142/4/e20182162

American Psychological Association. (2015). Guidelines for Psychological Practice With Transgender and Gender Nonconforming People, Guidelines 5 & 10. https://www.apa.org/practice/guidelines/transgender.pdf

The Mental Health of Transgender Youth: Advances in Understanding. (2016). *Journal of Adolescent Health and Medicine.* https://doi.org/10.1016/j.jadohealth.2016.06.012

PREA Standards and Policy Development Guidelines for Lesbian, Gay, Bisexual, Transgender and Intersex Inmates. http://www.wcl.american.edu/endsilence/documents/LGBTIAdultWebinarFINAL.pdf

EXHIBIT: INTERRUPTION
(Taken from the Transgender and Diverse Health Care in Correctional Settings,
 adopted by the National Commissions on Correctional Health Care Board of
 Directors)

health distress, impairment, and concerns should be addressed either prior to or concurrent with treatment for gender dysphoria.

7. Psychotherapy and other mental health treatment should be provided to transgender patients who are experiencing gender dysphoria, depressive disorders, PTSD, or anxiety disorders, or have experienced sexual trauma.

8. The clinical decision making to initiate or advance hormone medication treatment or candidacy for surgical interventions while incarcerated or upon release needs to be based on individual medical need, risks and benefits, analysis of alternatives, ruling out contraindications, accepted standards of care, and a thorough informed-consent process.

   a. Transgender patients with gender dysphoria who have not received hormone therapy before incarceration should be evaluated by a health care provider qualified in the area of gender-related health care to determine their evaluation and treatment needs.

   b. When determined to be medically necessary for a patient, after baseline laboratory studies are collected, hormone therapy or pubertal suppression should be initiated, and regular laboratory monitoring should be conducted according to accepted medical standards.

9. For transgender patients who received hormone therapy or pubertal suppression agents (with or without a prescription) before incarceration:

   a. If the prescription hormone therapy is verified, it should be continued without interruption (without waiting for a medical evaluation).

   b. If the patient took unprescribed hormones, decisions should be made on a case-by-case basis, with continuation of hormones when safe and appropriate.

   c. If previous hormone use cannot be verified, the patient should receive a medical evaluation for hormone therapy as soon as possible to minimize disruptions, or to determine if consultation with or referral to a transgender specialist is warranted.

The continuation of prior hormone medication, dose, and schedule would take into account the patient's medical risks and contraindications or other urgent medical reasons to the contrary. Ideally, hormone therapy would not be abruptly discontinued as this may result in a reversal of target physical characteristics, which could be a new stressor to the patient.

10. Evaluations to determine the medical necessity of gender-affirming surgical procedures will be performed on a case-by-case basis, applying a careful risk, benefit, and alternatives analysis. Gender-affirming procedures will be provided when determined to be medically necessary for a patient according to accepted medical standards.

EXHIBIT: REPRODUCTIVE HEALTH

## Other agents

Progestins, most commonly medroxyprogesterone, can be used for a short period of time to assist with menstrual cessation early in hormone therapy. CnRH agonists can be used similarly, as well as for refractory uterine bleeding in patients without an underlying gynecological abnormality.

## Bioidentical and Compounded Hormones

As discussion surrounding the use of bioidentical hormones in postmenopausal hormone replacement has heightened, interest has also increased in the use of similar compounds in feminizing/masculinizing hormone therapy. There is no evidence that custom compounded bioidentical hormones are safer or more effective than government agency-approved bioidentical hormones (Sood, Shuster, Smith, Vincent, & Jatoi, 2011). Therefore, it has been advised by the North American Menopause Society (2010) and others to assume that, whether the hormone is from a compounding pharmacy or not, if the active ingredients are similar, it should have a similar side-effect profile. WPATH concurs with this assessment.



# Reproductive Health

Many transgender, transsexual, and gender-nonconforming people will want to have children. Because feminizing/masculinizing hormone therapy limits fertility (Darney, 2008; Zhang, Gu, Wang, Cui, & Bremner, 1999), it is desirable for patients to make decisions concerning fertility before starting hormone therapy or undergoing surgery to remove/alter their reproductive organs. Cases are known of people who received hormone therapy and genital surgery and later regretted their inability to parent genetically related children (De Sutter, Kira, Verschoor, & Hotimsky, 2002).

Health care professionals—including mental health professionals recommending hormone therapy or surgery, hormone-prescribing physicians, and surgeons—should discuss reproductive options with patients prior to initiation of these medical treatments for gender dysphoria. These discussions should occur even if patients are not interested in these issues at the time of treatment, which may be more common for younger patients (De Sutter, 2009). Early discussions are desirable, but not always possible. If an individual has not had complete sex reassignment surgery, it may be possible to stop hormones long enough for natal hormones to recover, allowing

---

the production of mature gametes (Payer, Meyer, & Walker, 1979; Van den Broecke, Van der Elst, Liu, Hovatta, & Dhont, 2001).

Besides debate and opinion papers, very few research papers have been published on the reproductive health issues of individuals receiving different medical treatments for gender dysphoria. Another group who faces the need to preserve reproductive function in light of loss or damage to their gonads are people with malignancies that require removal of reproductive organs or use of damaging radiation or chemotherapy. Lessons learned from that group can be applied to people treated for gender dysphoria.

MtF patients, especially those who have not already reproduced, should be informed about sperm-preservation options and encouraged to consider banking their sperm prior to hormone therapy. In a study examining testes that were exposed to high-dose estrogen (Payer et al., 1979), findings suggest that stopping estrogen may allow the testes to recover. In an article reporting on the opinions of MtF individuals towards sperm freezing (De Sutter et al., 2002), the vast majority of 121 survey respondents felt that the availability of freezing sperm should be discussed and offered by the medical world. Sperm should be collected before hormone therapy or after stopping the therapy until the sperm count rises again. Cryopreservation should be discussed even if there is poor semen quality. In adults with azoospermia, a testicular biopsy with subsequent cryopreservation of biopsied material for sperm is possible, but may not be successful.

Reproductive options for FtM patients might include oocyte (egg) or embryo freezing. The frozen gametes and embryo could later be used with a surrogate woman to carry to pregnancy. Studies of women with polycystic ovarian disease suggest that the ovary can recover in part from the effects of high testosterone levels (Hunter & Sterrett, 2000). Stopping the testosterone briefly might allow for ovaries to recover enough to release eggs; success likely depends on the patient's age and duration of testosterone treatment. While not systematically studied, some FtM individuals are doing exactly that, and some have been able to become pregnant and deliver children (More, 1998).

Patients should be advised that these techniques are not available everywhere and can be very costly. Transsexual, transgender, and gender-nonconforming people should not be refused reproductive options for any reason.

A special group of individuals are prepubertal or pubertal adolescents who will never develop reproductive function in their natal sex due to blockers or cross-gender hormones. At this time there is no technique for preserving function from the gonads of these individuals.

EXHIBIT: TAU: GUIDELINES (Translational Andrology and Urology)

anomalies who were assigned gender at birth (1,2), as well as postmortem cadaveric studies (3). Estimation of prevalence of transgenderism has historically been challenging. The most recent estimates in the United States have been reported from survey studies, and range from 0.3–0.5% (4,5).

The number of transgender individuals seeking cross-sex hormone therapy has risen over the years (6). The administration of exogenous virilizing hormones is considered medically necessary for many transgender individuals (7). Many transgender men seek therapy for virilization and the mainstay treatment is exogenous testosterone. Transgender women desire suppression of androgenic effects and often use anti-androgen therapy with feminizing exogenous estrogens.

The purpose of this review is to present updates on the current hormonal regimens used by transgender patients, to discuss the safety and efficacy of these treatments, and to provide a summary of the current data that exist on both their short- and long-term effects.

## Guidelines

Both the World Professional Association for Transgender Health (WPATH) and the Endocrine Society have created transgender-specific guidelines to help serve as a framework for providers caring for gender minority patients. These guidelines are mostly based on clinical experience from experts in the field. Guidelines for hormone therapy in transgender men are mostly extrapolations from recommendations that currently exist for the treatment of hypogonadal natal men and estrogen therapy for transgender women is loosely based on treatments used for postmenopausal women.

In the past, the guidelines for hormone therapy initiation recommended that all patients undergo a "real life test" prior to starting medical therapy. This test required patients to live full-time as their self-affirmed gender for a predetermined period of time (usually 12 months) before starting cross-sex hormones. The recommendation was intended to help patients transition socially. However, both above-mentioned societies have recognized that this step is unreasonable for many patients as social transition can be very challenging if there is incongruence between an individual's self-affirmed gender and their physical appearance. As a result, the updated guidelines do not require this step, and instead, the societies recommend that patients transition socially and with medical therapy at the same time (7,8).

WPATH recommends that hormone therapy should be initiated once psychosocial assessment has been completed, the patient has been determined to be an appropriate candidate for therapy, and informed consent reviewing the risks and benefits of starting therapy has been obtained. Per WPATH, a referral is required by a qualified mental health professional, unless the prescribing provider is qualified in this type of assessment. The criteria for therapy include: (I) persistent well-documented gender dysphoria (a condition of feeling one's emotional and psychological identity as male or female to be opposite to one's biological sex) diagnosed by a mental health professional well versed in the field; (II) capacity to make a fully informed decision and to consent for treatment; (III) age of majority; and (IV) good control of significant medical and/or mental comorbid conditions.

This fourth criterion can sometimes be the most challenging to interpret. Many patients may have concurrent mood disorders related to their gender dysphoria, and experienced providers may have success alleviating the severity of these symptoms by allowing the patient to begin the medical transition process. Later in this review I discuss the effects hormones have on quality of life and perception of personal well-being. This is a key concept and should be considered when patients are being evaluated for hormone therapy initiation. Patients with comorbid psychiatric conditions should be closely monitored and mental health support remains paramount for these patients.

## Testosterone

William Basemore, AS-0426
SCI-Camp Hill
P.O. Box 8837
2500 Lisburn Road
Camp Hill, PA 17001



RECEIVED
SCRANTON

FEB 17 2023

PER _____
         DEPUTY CLERK

Office of The Clerk
United States District Court
Middle District of Pennsylvania
William J. Nealon Bldg. & U.S. Courthouse
235 North Washington Avenue
Scranton, PA 18501-1148

